755 N.W.2d 382 (2008)
276 Neb. 511
Michael G. PICK et al., Appellees,
v.
NORFOLK ANESTHESIA, PC, Appellant.
No. S-07-264.
Supreme Court of Nebraska.
September 5, 2008.
*384 David R. Buntain, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., Lincoln, for appellant.
Ronald E. Temple, of Fitzgerald, Vetter & Temple, Norfolk, for appellees.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

INTRODUCTION
Seven nurse anesthetists sued Norfolk Anesthesia, P.C., their former employer, seeking unpaid bonuses under the Nebraska Wage Payment and Collection Act (NWPCA). The nurse anesthetists, all of whom resigned on September 16, 2005, claim that Norfolk Anesthesia violated the NWPCA when it failed to pay them their annual bonuses. A bench trial was held in the district court for Madison County and ultimately resulted in a judgment in favor of the nurse anesthetists. The court awarded the nurse anesthetists damages and attorney fees. Norfolk Anesthesia now appeals. We reverse for reasons set forth below.

BACKGROUND
Norfolk Anesthesia was formed in 1995 by Dr. James Bertus. Dr. Cynthia Ferris joined the practice later that year, as did the seven nurse anesthetists in this case. In 1996, Ferris became a shareholder of the company. Dr. Chris Price joined the practice in 2003. Price joined the practice as an employee and did not become an actual shareholder until 2004.
Since its inception, Norfolk Anesthesia had a practice of paying out annual bonuses to physicians and nurse anesthetists. Until 2004, all of the bonuses were distributed at the company's annual holiday party which was held sometime after Thanksgiving and before Christmas.
In 2004, Bertus left Norfolk Anesthesia. The company bought out Bertus' shares, and Price replaced Bertus as co-owner of Norfolk Anesthesia with Ferris. Shortly after Price became a shareholder, he suggested that the physicians take their bonuses on a quarterly, rather than annual, basis. Ferris agreed. The nurse anesthetists continued to receive their bonuses on an annual basis at the company's holiday party.
On August 31, 2005, Price left Norfolk Anesthesia, making Ferris the sole remaining shareholder. There is some evidence that Price's decision to leave was brought about by a personal rift with Ferris. The company bought out Price's interest for an undisclosed amount. On September 2, 2 days after Price left, the seven nurse anesthetists collectively notified Ferris of their intent to resign effective September 16. At the time of their departure, the full-time nurse anesthetists were earning roughly $120,000 per year before bonuses. Ferris was the sole remaining employee in the office after the nurse anesthetists resigned, and Norfolk Anesthesia wound up its operations shortly *385 thereafter. Ferris did not pay the nurse anesthetists their annual bonuses for 2005.
The nurse anesthetists filed an amended complaint on January 3, 2007, seeking bonuses that had "accumulated and accrued" by the time they resigned. A bench trial was held on January 31. Testimony was presented by the seven nurse anesthetists, Ferris, and Lee Brandt, the bookkeeper for Norfolk Anesthesia. The nurse anesthetists testified that they were promised a bonus in their initial oral employment agreement with Bertus. There was testimony from several nurse anesthetists that pursuant to their agreement with Bertus, the bonuses came from the year-end profits of the company and were distributed at the company's holiday party. Several of the nurse anesthetists also testified that bonuses were dispersed on a 2:1 ratio such that the doctors would share two-thirds of the year-end profits, while the remaining one-third was split among the nurse anesthetists.
Brandt, the bookkeeper, testified that after the physicians switched to a quarterly bonus schedule, he began earmarking funds each quarter for the nurse anesthetists' year-end bonuses. On Brandt's worksheets, the funds were labeled "CRNA Bonus Accrual." ("CRNA" stands for "Certified Registered Nurse Anesthetist," the formal name for nurse anesthetists like those formerly employed at Norfolk Anesthesia.) Brandt made two such accruals for the first and second quarters of 2005, respectively. As of March 2005, $40,000 was allocated for the nurse anesthetists' bonuses. Another accrual was entered on the June 2005 worksheet in the amount of $48,000.
Brandt stated that earmarking the funds in this fashion helped him keep track of the money that would eventually be paid to the nurse anesthetists as part of their year-end bonuses. Brandt testified that Ferris knew of, but did not object to, his decision to track the money in this manner. (Ferris testified that she objected to Brandt's setting aside money in this fashion as soon as she learned about it.)
Brandt also testified that due to the buyout of Price's interest in Norfolk Anesthesia, the company did not have sufficient profits to pay the $88,000 that had accrued for the nurse anesthetists' bonuses. According to Brandt, the buyout left the company with a mere $15,251 in profits as of September 15, 2005, and paying $88,000 in accrued bonuses to the nurse anesthetists would result in a loss of $72,749 to the company.
Ferris reaffirmed the idea that the physicians' and nurse anesthetists' bonuses were to be based on a 2:1 ratio from the year-end profits of the company. However, Ferris denied the bonuses were intended to enhance productivity. She also testified that between 2001 and 2003, three employeesone physician and two nurse anesthetistsleft the company in the middle of the calendar year. None of these individuals received a whole or partial bonus even though, as the nurse anesthetists testified, one of these employees specifically requested her bonus.
The district court issued its order on February 12, 2007. The court found that in their verbal employment agreements with Norfolk Anesthesia, each of the nurse anesthetists was promised an annual bonus from the corporation's year-end profits. The court also found that the bonuses were paid according to the 2:1 ratio discussed earlier. It is not clear, however, whether the court found that this specific ratio was part of the bonus agreement between Bertus and the nurse anesthetists. The court did find, however, that there was no stated condition that the nurse anesthetists had to remain on staff for the full year in order to receive their *386 bonuses. Instead, the court concluded that the only stated condition was that the corporation had some profit at the end of the year. As such, the court concluded the bonuses were wages under the NWPCA.
While the court acknowledged that due to the buyout of Price's interest, the company had a profit of only $15,251 as of September 2005, it refused to accept that number because "the costs of buying out owners is not a proper deduction" to count against a corporation's profits. Finding no other evidence of Norfolk Anesthesia's actual net profits as of September 2005, the court concluded that the nurse anesthetists were entitled to the $88,000 in bonus accrual.
The court entered an award in the amount of $88,000 in damages, with $13,333 to each of the six full-time nurse anesthetists and $8,002 to the lone part-time nurse anesthetist. The court awarded an additional $3,333 in attorney fees to each of the six full-time nurse anesthetists and $2,000 in attorney fees to the part-time nurse anesthetist. Finally, the court ordered Norfolk Anesthesia to pay court costs. Norfolk Anesthesia appealed to the Court of Appeals, and we advanced the case to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state.[1]

ASSIGNMENTS OF ERROR
Norfolk Anesthesia assigns, restated, that the district court erred when it (1) found that the nurse anesthetists were entitled to payment of their annual bonuses for 2005 under the NWPCA and (2) awarded the nurse anesthetists damages in the amount of $88,000.

STANDARD OF REVIEW
In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly erroneous.[2] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[3]
When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.[4]

ANALYSIS
The NWPCA essentially permits an employee to sue his or her employer if the employer fails to pay the employee's wages as they become due.[5] "Wages" are defined as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis."[6] On the basis of this *387 language, we have held that a payment will be considered a wage subject to the NWPCA if (1) it is compensation for labor or services, (2) it was previously agreed to, and (3) all the conditions stipulated have been met.[7] In Knutson v. Snyder Industries, Inc.,[8] we held that a bonus qualifies as a wage subject to the NWPCA if these three criteria have been satisfied.
The district court foundand the parties agreethat the bonuses at issue were compensation for labor or services. The parties dispute, however, whether such payment was previously agreed to and whether the conditions stipulated have been met.
Regarding the existence of an agreement, Norfolk Anesthesia claims that there was no express agreement to pay bonuses. But the nurse anesthetists all testified that an annual bonus was part of an oral employment agreement entered into with Bertus when they were hired. The district court credited the nurse anesthetists' testimony and found that there was a prior agreement between the company and the nurse anesthetists regarding an annual bonus in late November or early December each year. Norfolk Anesthesia does not point to any evidence which might show that the district court clearly erred in making this determination.
This leaves only the third elementwhether the conditions stipulated have been met regarding payment of the bonuses to the nurse anesthetists. The district court found that the only express condition which would trigger Norfolk Anesthesia's obligation to pay the bonuses was that it had a profit at the end of the year. As such, the court concluded that there was no express condition that the nurse anesthetists stay on throughout the entire year in order to receive the bonuses. Although we do not quarrel with this factual finding, we disagree that the lack of such an express condition is dispositive.
In Knutson, an employer, Snyder Industries, Inc., refused to pay a bonus to an employee, Linda Knutson, who voluntarily resigned before receiving a bonus that she would have received had she remained on staff. As is true here, Snyder Industries' sole reason for refusing to pay Knutson the bonus was the fact she "was not employed at the time the bonus was to be paid."[9] We rejected this justification and awarded Knutson her bonus.
We recognized a distinction in Knutson between bonuses designed to "improve productivity" and those intended to "retain long-term employees."[10] Our conclusion that Knutson was entitled to a bonus was, at least in part, based on the fact that "the evidence in this case would support, if . . . not compel, a finding that the purpose of the bonus plan was to improve productivity."[11]
It is important to note, however, that Knutson did not involve an unqualified annual bonus. Instead, an express part of the bonus agreement was that the bonus would be paid provided "a certain profit level was reached for the fiscal year ending July 31, 1985."[12] While Knutson did not remain on staff long enough to actually receive her bonus, "she was employed *388 at the end of the fiscal year."[13] Viewed in light of that fact, Knutson does not disturb the commonsense notion that absent an express agreement otherwise, an employee ordinarily forfeits the right to receive a bonus by resigning before the corresponding bonus period ends.[14]
In Knutson, under the terms of the bonus agreement, the bonus period began on January 15, 1985, and concluded with the close of the company's fiscal year on July 31. By remaining on staff beyond July 31, Knutson fulfilled her obligation to remain on staff throughout the bonus period. But the same cannot be said here. All parties agree that this was an annual bonus based on the year-end profits from that calendar year and paid at the company's holiday party between late November and early December of each year. The relevant bonus period, then, was from late November or early December 2004 to late November or early December 2005. Therefore, when the nurse anesthetists resigned in September 2005, they, unlike Knutson, failed to remain on staff for the duration of the bonus period.
As noted above, an employee could still receive an annual bonus despite a premature resignation if the employer expressly promised to pay the bonus under such circumstances. But as Norfolk Anesthesia points out, the nurse anesthetists have not shown anything to suggest that anyone at Norfolk Anesthesia made such a promise. We conclude, therefore, that the nurse anesthetists lost their right to receive this bonus by resigning prematurely.

CONCLUSION
We conclude that under these facts, the nurse anesthetists forfeited their right to receive the annual bonus by resigning before late November 2005, the earliest date on which the bonus period for 2005 would have concluded. Because there was no express agreement by Norfolk Anesthesia to pay the bonus despite such a premature resignation, we conclude that the nurse anesthetists are not entitled to the annual bonus from 2005, and we reverse the district court's judgment.
REVERSED.
WRIGHT, J., not participating.
GERRARD, J., concurring.
I reluctantly concur in the result reached by the majority, but write separately to make clear the basis for my conclusion that the nurse anesthetists were not entitled to the annual bonus under these circumstances.
According to the nurses anesthetists' testimonies, their base salary was generally considered insufficient and the year-end bonus was intended to supplement this deficiency. Indeed, the record indicates that at some point in May 2004, Ferris presented the nurse anesthetists with the option of increasing their monthly salary and decreasing their year-end bonus. But, for whatever unfortunate reason, the nurse anesthetists declined this offer and instead chose to continue receiving a year-end bonus based on the year-end profits from each calendar year.
Given these circumstances, it is apparent that employment through the end of the bonus period was a known and negotiated condition of receiving the bonus. And the nurse anesthetists resigned on September 16, 2005, before the year-end bonuses had been distributed, and before the end of the calendar year upon which the bonuses were to be based on "year-end *389 profits." Because the nurse anesthetists were no longer employed at the time the bonuses were to have been distributed, they did not meet an essential employment condition of receiving the bonuses. Therefore, I concur in the judgment.
NOTES
[1] See Neb.Rev.Stat. § 24-1106(3) (Reissue 1995).
[2] Professional Bus. Servs. v. Rosno, 268 Neb. 99, 680 N.W.2d 176 (2004).
[3] Eicher v. Mid America Fin. Invest. Corp., 275 Neb. 462, 748 N.W.2d 1 (2008).
[4] Id.; Webb v. American Employers Group, 268 Neb. 473, 684 N.W.2d 33 (2004).
[5] See Neb.Rev.Stat. § 48-1231 (Reissue 2004).
[6] Neb.Rev.Stat. § 48-1229(4) (Supp.2007).
[7] See Knutson v. Snyder Industries, Inc., 231 Neb. 374, 436 N.W.2d 496 (1989).
[8] Id.
[9] Id. at 375, 436 N.W.2d at 498.
[10] Id. at 377, 436 N.W.2d at 499.
[11] Id.
[12] Id. at 375, 436 N.W.2d at 498 (emphasis supplied).
[13] Id.
[14] Cf. Sinnett v. Hie Food Products, Inc., 185 Neb. 221, 174 N.W.2d 720 (1970).