776 N.W.2d 188 (2009)
278 Neb. 1027
BSB CONSTRUCTION, INC., a Nebraska corporation, appellee and cross-appellant,
v.
PINNACLE BANK, a Nebraska corporation, appellant and cross-appellee.
No. S-09-018.
Supreme Court of Nebraska.
December 4, 2009.
*191 Todd R. McWha and S. David Schreiber, of Waite, McWha & Harvat, North Platte, for appellant.
Nichole S. Bogen, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
MILLER-LERMAN, J.

NATURE OF THE CASE
This appeal involves the release of funds by appellant, Pinnacle Bank (Pinnacle), from an escrow account for the benefit of appellee and cross-appellant, BSB Construction, Inc. (BSB), to an entity other than BSB. BSB had contracted with TC Properties LLC to construct two roads in a community development. An online bank account was opened with Pinnacle, *192 and money was deposited in the account to pay BSB. When additional costs for construction of the development arose, TC Properties transferred money out of the account and into one of TC Properties' other accounts with Pinnacle to cover the additional costs.
BSB filed an action in the district court for Lancaster County. BSB claimed, inter alia, that Pinnacle breached the terms of the agreements governing the bank account. Upon summary judgment, the district court concluded that the bank account was an escrow account and that Pinnacle had breached its duties to the detriment of BSB. The district court thereafter held a trial on certain amounts owed to BSB. Pinnacle appeals the money judgment entered against it, and BSB cross-appeals, challenging the amount of the damages awarded and the denial of attorney fees and prejudgment interest. We affirm.

STATEMENT OF FACTS
TC Properties was established in 2000 to create the Trails Crossing Resort project, a resort-type community on the south shore of Lake McConaughy in Keith County, Nebraska. TC Properties had a planned unit development approved by Keith County officials that included 1,700 residential units, a commercial complex area, two golf courses, and a variety of other amenities.
Dennis Rosengarten was the president and general manager of TC Properties and was responsible for the financial and legal aspects of the project. Dan Eggers was a TC Properties employee who was responsible for handling all of the construction-related issues on the project, including supervising the project manager, Todd Hatterman.
The lender for the project was SLF Series A, LLC, a Utah limited liability company. SLF Series A designated T Capital Partners as the administrator for the project, whose duties involved overseeing the progress of the construction, the distribution of funds, and the payment of submitted draw requests.
In April 2004, TC Properties contracted with BSB to construct two roads. The procedure for paying BSB was set forth in the road construction contract, which stated:
Upon approval of progress payment by [the project engineer] and [TC Properties], [TC Properties] will submit a "Draw Authorization" form . . . to [T Capital Partners] for approval. This authorization will include the signatures of [TC Properties, the project engineer, and T Capital Partners] for approval of payout as defined in paragraph 502.2[sic] above. Once approved for payout, an officer of Pinnacle Bank of Ogallala will acknowledge receipt of "Draw Authorization" and proceed to issue payment of [BSB's] progress payment invoice from the "draw-down" account established at Pinnacle Bank by [T Capital Partners and TC Properties]. [T Capital Partners] agrees to fund the draw-down account in the amount of [BSB's] bid defined in 501.D above. Proof of these funds will be submitted to [BSB] prior to start-up.
Norma Lashley (Norma), as president of BSB, signed the contract. Norma has been the president of BSB since 2002. In April 2004, Norma oversaw all aspects of the construction business and all contracts and was solely responsible for the company's financial matters. Ted Lashley (Ted), Norma's son, was vice president of BSB and put together bids on projects. Ted's bids had to be approved by Norma before they could be submitted.
On April 22, 2004, TC Properties opened an account (Account 31101) with Pinnacle, *193 a Nebraska corporation, located in Ogallala, Nebraska. This account, which is at issue in this case, was opened to pay BSB under the road construction contract discussed above. The account was an online account and was opened because BSB wanted assurance that money would be available to pay it under the terms of the road construction contract, and T Capital Partners was not willing to deposit its financing money into TC Properties' general account. T Capital Partners wanted to exercise some control over the distribution of the moneys being lent on the Trails Crossing Resort project.
On April 22, 2004, to address the concerns of T Capital Partners and BSB, TC Properties, T Capital Partners, and Pinnacle entered into an addendum with respect to the account. The addendum stated:
1. Account [31101] is a single payer account only to BSB. . . .
2. Pinnacle . . . is not responsible to verify the authenticity of any of the signatures of the other signatories on the Draw Authorization Form and shall have not [sic] liability in connection therewith.
3. . . . Hatterman is hereby authorized to release such funds from said account each time the Draw Authorization Form pertaining thereto is duly executed by all the Signatories.
On April 22, 2004, $338,250.47 was deposited into the account, representing that the funds were available to cover the amount of BSB's initial contract price.
In early May 2004, TC Properties became aware that a new water law was going to require it to have more water available to the project by July 1. In order to comply with the new law, TC Properties had to have wells drilled or contracts in place prior to July 1, to provide the additional water required. T Capital Partners was not willing to have money from Account 31101 used for drilling or acquisition. Nevertheless, between May 10 and September 30, in order to cover the new expenses, Eggers, with the authorization of Rosengarten, transferred $92,000 online out of Account 31101 to another TC Properties account serviced by Pinnacle. The $92,000 was paid to people and entities other than BSB.
Eggers testified that once discovering the need for additional water, he had a conversation with Ted and Rosengarten. The witnesses dispute what was discussed in the conversation. Eggers contends that after he informed Ted that without additional funds, the project could not go forward, Ted approved the transfer of money out of Account 31101 to another TC Properties account. Ted denies that he had this conversation. Rosengarten remembers the conversation but does not recall Ted's consenting to Eggers' transferring the funds. Norma stated that she was not informed by Ted or anyone at TC Properties prior to October 2004 that the money was being transferred out of Account 31101.
BSB attempted to recover the funds removed from the account but was unsuccessful. BSB thereafter filed this action in the district court for Lancaster County against Pinnacle, claiming, inter alia, that Pinnacle breached the addendum and was negligent in administering the account. The parties filed cross-motions for summary judgment. The district court received evidence and granted partial summary judgment in favor of BSB. The district court concluded that Account 31101 was an escrow account and found that there were no genuine issues as to any material facts as to whether BSB was a third-party beneficiary of the addendum to the account, whether Pinnacle violated the terms of the April 22, 2004, addendum to Account *194 31101, and whether BSB was owed $56,445.09 in damages for retainage and for trenching and seedwork. The district court found there were genuine issues of material fact concerning the amount owed to BSB with respect to the delivery and placement of the construction material referred to as "riprap" and partially denied BSB's motion on this ground and set this aspect of the damage claim for trial. The district court denied Pinnacle's motion for summary judgment.
The case was tried on the issue of the riprap. After trial, the district court entered an order finding that BSB was owed $38,040.12 in damages for the riprap and that BSB was not entitled to attorney fees or prejudgment interest. Pinnacle appealed, and BSB cross-appealed.

ASSIGNMENTS OF ERROR
Pinnacle claims, restated and summarized, that the district court erred in (1) concluding that the Pinnacle Account 31101 was an escrow account and that as such, Pinnacle was liable to BSB for any losses that resulted if Pinnacle violated the terms of the addendum; (2) finding that BSB's failure to obtain a signed draw authorization form was not a bar to BSB's recovery; (3) denying Pinnacle's request to raise an issue of "contract interpretation" at the pretrial conference; (4) finding that there was no issue of material fact whether BSB consented to TC Properties' withdrawals from Account 31101; and (5) awarding BSB the sum of $38,040.12 for the delivery and placement of the riprap. On cross-appeal, BSB claims that the district court erred in (1) awarding it $38,040.12 rather than $41,341.20 for the riprap and (2) failing to award BSB attorney fees and prejudgment interest.

STANDARDS OF REVIEW
When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. Harvey v. Nebraska Life & Health Ins. Guar. Assn., 277 Neb. 757, 765 N.W.2d 206 (2009).
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Hauptman, O'Brien v. Turco, 277 Neb. 604, 764 N.W.2d 393 (2009). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Id.
In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly erroneous. Pick v. Norfolk Anesthesia, 276 Neb. 511, 755 N.W.2d 382 (2008). In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. Id.

ANALYSIS

Appeal: Pinnacle Account 31101 Was an Escrow Account, and Pinnacle Was Bound by the Duties of an Escrow Account Depositary.
Pinnacle claims on appeal that the district court erred in concluding that the bank account in question was an escrow account. We reject this claim.
*195 Pinnacle argues that Account 31101 was not an escrow account and that TC Properties was allowed to transfer funds from the account. Pinnacle claims that the terms of the account do not satisfy the definition of an escrow account. Pinnacle notes that the account was not titled as an escrow account but instead was called a single-payer account. Pinnacle suggests that the proper characterization of the account created a genuine issue of material fact which precluded summary judgment.
This court has previously stated that "`an escrow . . . is properly defined as "a written instrument, which by its terms imports a legal [duty that a deposit is] to be kept by the depositary until the performance of a condition or the happening of a certain event and then to be delivered over to take effect." . . .'" Pike v. Triska, 165 Neb. 104, 119, 84 N.W.2d 311, 321 (1957). See, similarly, In re ANR Advance Transp. Co., Inc., 247 B.R. 771 (E.D.Wis.2000); 28 Am.Jur.2d Escrow § 1 (2000); Black's Law Dictionary 20 (9th ed.2009) (defining "escrow account"). It is well settled that "[n]o precise form of words is necessary to create an escrow. The term `escrow' need not be used." 28 Am.Jur.2d, supra, § 6 at 8-9.
We agree with the district court that as a matter of law, the account at issue in this case was an escrow account. Although Account 31101 was not titled as an escrow account, given the addendum, it possessed all of the hallmarks of an escrow, including that Pinnacle was required to hold the money deposited in the account until the happening of the identified condition, which in this case was the receipt of a draw authorization form signed by the specified persons, at which time the money could be transferred solely to BSB. Therefore, the district court properly determined that Account 31101 was an escrow account.
With respect to the duties of a depositary of an escrow, our jurisprudence establishes:
Where a [party] assumes to and does act as the depositary in escrow, [it] is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. [It] is held to strict compliance with the terms of the escrow agreement. If [it] violates instructions or acts negligently, [it] is ordinarily liable for any loss occasioned by [its] breach of duty.
Katleman v. U.S. Communities, Inc., 197 Neb. 443, 447, 249 N.W.2d 898, 901 (1977). See, also, A.G.A. Inc. v. First Nat. Bank, 239 Neb. 74, 474 N.W.2d 655 (1991).
Because we have concluded that Pinnacle Account 31101 was an escrow account, Pinnacle was required to strictly comply with the terms of the addendum, including the requirement that payments be made solely to BSB and not without a draw authorization form signed by TC Properties and T Capital Partners representatives. By allowing TC Properties to transfer significant sums into another account, Pinnacle violated these terms and is liable for the loss suffered by BSB.
Pinnacle devotes considerable argument on appeal to the effect that BSB is precluded from recovering losses attributable to the lack of sufficient funds in Account 31101, because BSB did not submit a properly endorsed draw authorization form for the requested sums prior to filing suit. Under the controlling documents, in the ordinary course, the draw authorization form would include the signature of a TC Properties representative. However, because TC Properties was in the process of improperly diminishing the funds in the account, we believe it is neither logical nor required that BSB have attempted in vain *196 to obtain the signature of the very entity that was in the course of improperly transferring the funds out of Account 31101 as a condition precedent to BSB's recovery of the funds taken. The law does not require a party to perform a useless act. See Bank of Papillion v. Nguyen, 252 Neb. 926, 567 N.W.2d 166 (1997).
In sum, because Account 31101 was an escrow account, and because Pinnacle did not comply with the terms and conditions of the agreement governing the account, we affirm the district court's decision that there were no genuine issues of material fact whether Pinnacle was liable for the losses BSB suffered as a result of TC Properties' improperly removing funds from the account.
Our resolution of these assignments of error effectively resolves Pinnacle's assigned error claiming that the district court erred when it denied Pinnacle's request to raise at the trial what Pinnacle described as an issue of "contract interpretation." In its pretrial conference memorandum, which was submitted after the entry of summary judgment, Pinnacle stated that there existed an issue of law as to whether "the construction contract require[d] that TC Properties and [T] Capital [Partners] fund Pinnacle Bank Checking Account [31101] for both the original contract amount and change orders." BSB objected to Pinnacle's raising this issue at this late stage in the proceedings. The district court directed the parties to brief the matter. After briefing, the court entered an order denying Pinnacle's request to raise the issue of contract interpretation. The district court reasoned that because the court had entered summary judgment on the contractual status of the parties, this issue had been implicitly resolved and the only issue remaining for trial was the amount BSB was owed for the riprap.
We agree with the district court's reasoning and conclusion on this issue. The additional "contract interpretation" issue raised by Pinnacle goes to the issue of Pinnacle's liability under the controlling agreements and the law. The partial summary judgment order entered by the district court resolved the issue of Pinnacle's liability, and the only issue remaining was the amount of damages owed BSB for the riprap. Therefore, the issue of "contract interpretation" raised by Pinnacle in the pretrial memorandum had been resolved and was not relevant to the trial. The court properly disallowed the issue to be raised at trial.

Appeal: There Was No Genuine Issue of Material Fact Whether BSB Consented to the Withdrawal of Funds by TC Properties From Account 31101.
Pinnacle next argues that there was a genuine issue of material fact whether BSB consented to the withdrawal of funds by TC Properties from Account 31101, precluding the grant of summary judgment in favor of BSB on the issue of liability. Pinnacle claims in effect that BSB waived the escrow features of the account. In support of this argument, Pinnacle points to testimony relative to a conversation among Ted, Eggers, and Rosengarten about which Eggers testified and stated that Ted agreed that TC Properties could transfer the funds. Although there may be a dispute as to this conversation, given the terms of the escrow account and Ted's unchallenged lack of authority, any dispute is not material.
The district court concluded that there was no "waiver" by BSB which would allow TC Properties to remove the funds from the account. The court reasoned that, in addition to Account 31101's being an escrow account, it is undisputed that Ted did not have the authority to act on behalf of BSB with respect to the disposition of *197 funds. Instead, the undisputed evidence showed that Norma had that authority and that Norma did not participate in the conversation. Further, as the court noted, Rosengarten, who was said to be a party to the conversation with Eggers and Ted, does not recall Ted's giving Eggers permission to remove the funds. Under the evidence, the court noted that Pinnacle was at no time informed that TC Properties had purportedly obtained BSB's consent to remove the funds. The district court determined that, even taking the inferences in favor of Pinnacle, there had not been an effective agreement between BSB and TC Properties about which Pinnacle was informed, allowing TC Properties to remove the funds.
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material facts or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Lamar Co. v. City of Fremont, 278 Neb. 485, 771 N.W.2d 894 (2009). A party moving for summary judgment must make a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial. Appleby v. Andreasen, 276 Neb. 926, 758 N.W.2d 615 (2008). Once the moving party makes a prima facie case, the burden to produce evidence showing the existence of a genuine issue of material fact that prevents judgment as a matter of law shifts to the party opposing the motion. See id.
We agree with the district court's determination that BSB demonstrated its entitlement to judgment and that Pinnacle did not show the existence of a genuine issue of material fact whether BSB consented to the removal of the funds. Although there may have been a dispute about the contents of the conversation on which Pinnacle relies, the undisputed fact that Ted was without authority to consent to the transfer of funds out of escrow Account 31101 renders any such dispute not material. Therefore, we affirm the district court's grant of partial summary judgment in favor of BSB.

Appeal and Cross-Appeal: The Trial Court Did Not Err in Awarding $38,040.12 to BSB for the Riprap.
On cross-appeal, BSB claims that the district court erred in awarding it $38,040.12 rather than $41,341.20 for the riprap. On appeal, Pinnacle claims that BSB's evidence was insufficient to establish its damages for the riprap. We find no error by the district court.
On appeal, both parties challenge the amount of damages awarded for the riprap. Pinnacle argues that the trial court's award was in error because there was no support in the record for the amount awarded and that it is impossible to determine how the court arrived at the figure it awarded. BSB argues that the court erred in not awarding it the $41,341.20 it requested in damages. BSB contends that it presented evidence that showed it was due $42,944.40 for the riprap and that by removing 96 tons and mitigating its damages by $1,603.20, it was owed $41,341.20.
The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. State ex rel. Stenberg v. Consumer's Choice Foods, 276 Neb. 481, 755 N.W.2d 583 (2008).
In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most *198 favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. Pick v. Norfolk Anesthesia, 276 Neb. 511, 755 N.W.2d 382 (2008).
With respect to the issue of damages relative to the riprap, at trial, the court heard the testimony of Ted and Norma of BSB and that of Hatterman, the Trails Crossing Resort project manager. Further, the district court reviewed evidence submitted, including invoices and certificates for payments. In its order, the court found that exhibit 14 showed that BSB was owed $42,944.40 for the riprap on "Change Order 6," as of November 2004. The court found the evidence established that prior to that date, 840.6 tons of riprap had been delivered to the Trails Crossing Resort project, and of that 840.6 tons, 96 tons were removed and delivered to another entity, leaving 744.6 tons. The trial court noted in its order the discrepancy between the testimony of Ted and the testimony of Hatterman with respect to the amount of riprap at the construction site.
As Pinnacle acknowledges, there was a conflict in the evidence at trial concerning the amount of riprap that was actually "placed." The following exchange occurred at the trial in regard to this conflict:
THE COURT: Okay. And your position would be that [the riprap] that's laid gets the $60 [a ton]; [the riprap] that's not laid, does not get 8 to $10 because it hasn't been laid yet, and so that's taken off the 60, so it would be either 50 or 52.
[Counsel for Pinnacle]: Correct.
THE COURT: Once you determine how much is left out there.
[Counsel for Pinnacle]: Exactly.
. . . .
THE COURT: . . . I mean, at least what I heard [counsel for Pinnacle] talking about was the difference between laid and not laid. And the testimony was, laid, the cost is eight to ten bucks. So if I determine "x" amount wasn't laid, regardless of what was invoiced for, then I would take that amount and just subtract, from 60, eight to ten dollars and then multiply that figure times whatever I determine has not been laid. . . .
Based on this record, it is clear that in weighing the evidence at trial, the district court accepted BSB's evidence showing that after the removal of the 96 tons of riprap, BSB was owed $41,341.20, but credited Pinnacle $3,301.08 for the riprap it concluded was not "placed." Taking all inferences in favor of the successful party, and not reweighing the evidence presented to the trial court, see Pick v. Norfolk Anesthesia, supra, we determine that the award is reasonably related to the evidence presented at trial, and we reject the assignments of error on appeal and cross-appeal related to this issue and affirm the district court's award of damages at trial.

Cross-Appeal: It Was Not Error for the Trial Court to Deny BSB Attorney Fees and Prejudgment Interest.
The remaining issues on cross-appeal are BSB's claims that it was entitled to attorney fees and prejudgment interest. We determine that the district court did not err when it denied BSB's request for attorney fees and prejudgment interest.

Attorney Fees.
BSB argues that it was owed attorney fees pursuant to various provisions of Nebraska's Uniform Commercial Code (U.C.C.), Neb. U.C.C. § 1-101 et seq. (Reissue 2001). The following U.C.C. provisions *199 are relevant to our consideration of BSB's cross-appeal claiming attorney fees.
Section 4A-305 states:
(a) If a funds transfer is completed but execution of a payment order by the receiving bank in breach of section 4A-302 results in delay in payment to the beneficiary, the bank is obliged to pay interest to either the originator or the beneficiary of the funds transfer for the period of delay caused by the improper execution. Except as provided in subsection (c), additional damages are not recoverable.
(b) If execution of a payment order by a receiving bank in breach of section 4A-302 results in (i) noncompletion of the funds transfer, (ii) failure to use an intermediary bank designated by the originator, or (iii) issuance of a payment order that does not comply with the terms of the payment order of the originator, the bank is liable to the originator for its expenses in the funds transfer and for incidental expenses and interest losses, to the extent not covered by subsection (a), resulting from the improper execution. Except as provided in subsection (c), additional damages are not recoverable.
. . . .
(e) Reasonable attorney's fees are recoverable if demand for compensation under subsection (a) or (b) is made and refused before an action is brought on the claim. If a claim is made for breach of an agreement under subsection (d) and the agreement does not provide for damages, reasonable attorney's fees are recoverable if demand for compensation under subsection (d) is made and refused before an action is brought on the claim.
Section 4A-103 defines "payment order" as follows:
(1) "Payment order" means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
(i) the instruction does not state a condition to payment to the beneficiary other than time of payment.
The thrust of BSB's claim is that under § 4A-305(e), a bank can be liable for attorney fees in connection with a wrongful payment if demand for compensation is made on the bank for payment and payment is refused before an action is brought on the claim. We will assume but do not decide that the transfers on which BSB relies were "funds transfers" referred to in § 4A-305(a) and (b). By definition, to fall within the scope of § 4A-305, upon which BSB relies for its claim of attorney fees, a transaction must begin with a "payment order," the definition of which refers to a "receiving bank" or "another bank," which we will assume without deciding includes Pinnacle.
In this case, BSB claims that the June 8, 2005, demand letter sent by its counsel to Pinnacle requesting payment after discovery of the missing funds should be treated as its "payment order." The letter stated in relevant part: "Please be advised that this office needs to receive a cashier's check or money order payable to BSB . . . in the amount of $95,897.56 no later than 5:00 p.m. on Monday, June 17, 2005."
By definition, the instructions associated with a "payment order" must not state conditions, and cases and treatises have noted that in determining whether an article 4A applies, it is necessary first to determine if the payment order is or is not conditional. See Trustmark Ins. Co. v. Bank One, Arizona, NA, 202 Ariz. 535, 48 P.3d 485 (Ariz.App.2002) (citing Alvin C. Harrell, UCC Article 4A, 25 Okla. City *200 U.L.Rev. 293 (2000)). White and Summers' treatise on the U.C.C. explains that although a "payment order" need not order immediate payment, and may specify that a certain amount of money must be paid on a certain date to a particular beneficiary, imposition of other conditions are inconsistent with the definition of a "payment order." The treatise states:
To understand why the drafters did not wish to involve banks in inquiries into whether other conditions have occurred, let us return to the transactions that are contemplated by Article 4A: "The function of banks in a funds transfer under Article 4A is comparable to the role of banks in the collection and payment of checks in that it is essentially mechanical in nature. The low price and high speed that characterize funds transfers reflect this fact. Conditions to payment. . . other than time of payment impose responsibilities on [the] bank that go beyond those in Article 4A funds transfers."
3 James J. White & Robert S. Summers, Uniform Commercial Code § 22-3 at 25 (5th ed.2008).
Even assuming that the June 8, 2005, letter was intended to transfer funds, compare § 4A-104(a), and even assuming Pinnacle could be characterized as a "receiving bank," compare § 4A-305, the demand letter failed to meet the test of certainty required for a "payment order" under § 4A-103(a)(1). By its terms, the letter provides for a period of time during which the amount demanded may be paid but does not direct payment be made on a date certain and no other. We conclude that BSB's reliance on article 4A of the U.C.C. as a basis for attorney fees is misplaced. Therefore, we conclude that it was not error for the district court to deny BSB's request for attorney fees under § 4A-305.

Prejudgment Interest.
BSB asserts that it is entitled to prejudgment interest based on two distinct theories. First, BSB argues that it is entitled to prejudgment interest pursuant to Neb.Rev.Stat. § 45-104 (Reissue 2004), because Pinnacle wrongfully "retained" BSB's funds. In the alternative, BSB argues that it was entitled to prejudgment interest pursuant to Neb.Rev.Stat. § 45-103.02 (Reissue 2004) on the $56,445.09 awarded upon partial summary judgment, which it characterizes as the "liquidated" portion of its damages. We conclude that under either theory, it was not error for the district court to deny BSB prejudgment interest.
Section 45-104 states:
Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment. Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.
As Pinnacle notes in opposition to BSB's claim for prejudgment interest, § 45-104 provides the interest rate for prejudgment interest upon the happening of events outlined in the statute. The actions of Pinnacle at issue in this case involve Pinnacle's release of funds to an entity other than BSB. As such, the subject matter of the present action is not one listed in § 45-104 *201 and prejudgment interest is not warranted under § 45-104.
BSB also claims that it is entitled to prejudgment interest under § 45-103.02 on the purported liquidated portion of its damages. See Travelers Indemnity Co. v. International Nutrition, 273 Neb. 943, 734 N.W.2d 719 (2007). Prejudgment interest under § 45-103.02 is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to either the plaintiff's right to recover or the amount of such recovery. Travelers Indemnity Co. v. International Nutrition, supra. A two-pronged inquiry is required to determine whether a claim is liquidated. There must be no dispute either as to the amount due or as to the plaintiff's right to recover. Id.
BSB argues it is entitled to prejudgment interest on the portion of damages it was awarded on summary judgment, which damages it claims were liquidated. However, our review of the record indicates that there was a reasonable controversy as to the nature and extent of BSB's work, and therefore, the damages were uncertain and required evidentiary testing at the summary judgment hearing and at trial. We cannot say that the damages were liquidated. Therefore, it was not error for the trial court to deny BSB prejudgment interest and this decision is affirmed.

CONCLUSION
With respect to the appeal, we conclude that the district court was correct when it concluded that Account 31101, the Pinnacle single-payer account controlled by the addendum, was an escrow account. As such, Pinnacle had a duty to comply with the terms of the addendum governing the account and to release the funds only to BSB. By releasing funds to an entity other than BSB, Pinnacle failed to comply with the terms of the addendum. The district court correctly determined that Pinnacle was liable to BSB, and we affirm the district court's grant of partial summary judgment in favor of BSB and the damages awarded pursuant the judgment after trial.
With respect to the cross-appeal, because the damages award for the riprap was supported by the evidence, we affirm the award of damages at trial. We further conclude that the demand letter sent by BSB does not qualify as a payment order as defined in the U.C.C. and that the U.C.C. provision upon which BSB relies does not support an award of attorney fees. Finally, we determine that under the facts of this case, there is no basis for an award of prejudgment interest to BSB. The district court's decision is affirmed in all respects.
AFFIRMED.
STEPHAN, J., not participating.