Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/16/2019 12:07 AM CDT

David Weyh, appellee, v.
Barry Gottsch, appellant.
___ N.W.2d ___

Filed June 7, 2019.    No. S-18-192.

1. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. But an appellate court independently reviews questions of law decided by a lower court.

2. **Limitations of Actions: Appeal and Error.** The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.

3. **Declaratory Judgments: Contracts: Appeal and Error.** An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. When a dispute sounds in contract, the action is to be treated as one at law. An appellate court treats the determination of factual issues in such a declaratory judgment action which was tried without a jury in the same manner as any other action at law; accordingly, the findings of the trial court have the effect of a verdict and will not be set aside unless clearly wrong.

4. **Prejudgment Interest: Appeal and Error.** Awards of prejudgment interest are reviewed de novo.

5. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law on which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

6. **Limitations of Actions: Contracts.** An action upon an oral contract must be brought within 4 years from the date of the event giving rise to the cause of action.

7. **Actions: Contracts: Time: Damages.** A cause of action in contract accrues at the time of breach or the failure to do the thing agreed to.

This is so even though the nature and extent of damages may not be known.

8. **Limitations of Actions.** Generally, a cause of action accrues and the period of limitations begins to run upon the violation of a legal right, that is, when the aggrieved party has the right to institute and maintain suit.

9. **Contracts: Judgments: Appeal and Error.** The disputed terms of an oral agreement are questions of fact, and in a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.

10. **Trial: Witnesses: Evidence: Appeal and Error.** In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.

11. **Trial: Expert Witnesses: Appeal and Error.** Generally, an appellate court reviews a trial court's decision to exclude expert testimony for an abuse of discretion.

12. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

13. **Statutes: Appeal and Error.** When an appellate court construes statutes relating to the same subject matter, it should do so in a manner that maintains a sensible and consistent scheme and gives effect to every statutory provision.

14. **Statutes.** It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

15. **Prejudgment Interest: Statutes.** Neb. Rev. Stat. §§ 45-103.02 and 45-104 (Reissue 2010) are alternate and independent statutes authorizing the recovery of prejudgment interest.

16. **Prejudgment Interest.** Neb. Rev. Stat. § 45-104 (Reissue 2010) contains no requirement that the claims described therein must also be liquidated in order to recover prejudgment interest.

17. **Judgments: Interest: Time.** Prejudgment interest under Neb. Rev. Stat. § 45-104 (Reissue 2010) ends, and postjudgment interest begins, on the date of entry of judgment.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed as modified.

Molly J. Miller, Patrick J. Sullivan, and Travis M. Jacott, of Adams & Sullivan, P.C., L.L.O., for appellant.

Cathy S. Trent-Vilim, Daniel P. Chesire, Brian J. Brislen, and Adam R. Feeney, of Lamson, Dugan & Murray, L.L.P., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

Pursuant to an oral agreement, David Weyh and Barry Gottsch farmed together for approximately 10 years and agreed to share net profits equally. When the farming operation ended and it was time to settle up, a dispute arose and Weyh filed this action seeking to recover his share of the operation's profits. After a bench trial, the district court found that Gottsch owed Weyh $1,214,056.73 in unpaid profits. It also found that Weyh was entitled to prejudgment interest in the amount of $972,582.10 pursuant to Neb. Rev. Stat. § 45-104 (Reissue 2010).

Gottsch appealed, and we granted bypass to address the assignments of error related to recovery of prejudgment interest under Nebraska law. On that issue, Gottsch argues that all requests for prejudgment interest must comply with Neb. Rev. Stat. § 45-103.02 (Reissue 2010), and he contends it was error to award prejudgment interest under § 45-104 without also finding Weyh's claim was liquidated under § 45-103.02(2). Weyh disagrees, and argues §§ 45-103.02(2) and 45-104 provide alternate routes for recovering prejudgment interest. Weyh contends that because his claim is the type of claim enumerated in § 45-104, prejudgment interest was properly awarded.

After examining the statutory language and legislative history of the pertinent statutes, and considering our competing lines of authority on prejudgment interest, we hold that § 45-103.02(2) is not the exclusive means of recovering

prejudgment interest in Nebraska, and we disapprove of prior cases holding otherwise. We clarify that §§ 45-103.02 and 45-104 provide separate and independent means of recovering prejudgment interest, and we hold that when a claim is of the types enumerated in § 45-104, then prejudgment interest may be recovered without regard to whether the claim is liquidated. We thus find no error in applying § 45-104 to award prejudgment interest to Weyh, but we agree with Gottsch there was an error in calculating prejudgment interest. We affirm the judgment as modified.

## I. FACTS

In October 2004, Weyh and Gottsch entered into an oral agreement to farm together. They agreed Weyh would provide the labor and manage the day-to-day farming operations. They agreed Gottsch would provide the equipment and some occasional labor and would handle all the financial aspects of the farming operation. They agreed the operation would farm some land owned by Gottsch and some land owned by third parties. They agreed the operation would continue from year to year until one of them decided to end it, and they agreed to share the net profits of the farming operation equally. Their agreement was never reduced to writing.

Weyh and Gottsch farmed together continuously through the 2014 harvest. During that period, Weyh performed work on the farm nearly every day and also hired and supervised additional laborers. Weyh kept a general log of his daily farming activities. He did not take a salary or wage from the farming operation, but Gottsch occasionally provided Weyh with what the parties described as "draws against future profits." Both parties understood those draws were being advanced against Weyh's share of the farming operation's net profits once they finally "settled up." While the farming operation was ongoing, Gottsch and Weyh did not settle up at the end of each farming year. Instead, it was understood that when one or both of them decided to end the farming operation, Gottsch

would provide an accounting and the net profits would then be determined and distributed equally.

Gottsch purchased the planting and harvesting equipment for the farming operation, and he was responsible for marketing the crops and keeping the farming operation's books. All proceeds from the farming operation went into bank accounts controlled exclusively by Gottsch. Gottsch also used these accounts for his personal expenses and for some of his other business endeavors. Gottsch's bookkeeper, Debra Wetzel, maintained the books for the farming operation and for Gottsch's other businesses. After the farming operation ended, Wetzel prepared a profit-and-loss statement for the entire farming operation. While the farming operation was ongoing, there was no formal accounting prepared.

In October 2014, Gottsch notified Weyh he had decided to end the farming operation and it was time to "settle up." Shortly thereafter, Gottsch told Weyh the entire farming operation generated net profits of $1,518,115.65. Gottsch arrived at that figure by expensing to the farming operation, among other things, $1,813,164.15 for accumulated rent on land owned by Gottsch and farmed by the operation, and $144,161.04 for earnings paid to one of Gottsch's employees, Philip Kollars, who sometimes worked for the farming operation. Weyh disputed both these expenses, claiming neither was properly attributed to the farming operation.

### 1. Complaint

In December 2014, Weyh sued Gottsch in the district court for Sarpy County, Nebraska, seeking to recover his share of the net profits of the farming operation. Weyh's complaint set out the parties' oral agreement and alleged several theories of recovery, including breach of contract. The complaint alleged the farming operation's net profits totaled $3,475,440.70, and Weyh sought to recover half of that amount plus prejudgment interest.

Gottsch's answer admitted he had failed to pay Weyh the agreed upon one-half share of net profits and admitted he was

in possession of money belonging to Weyh. But Gottsch alleged that a profit-and-loss statement had not yet been completed for the 2014 crop year, and further alleged that a final accounting and payment had been "hindered" by Weyh's demands to change the profit-and-loss statement. Gottsch admitted that his "failure to perform his obligations under the contract has damaged [Weyh] in an amount to be determined following a full accounting," but he denied that Weyh was entitled to recover the amount sought in the complaint.

## 2. Amended Complaint

Eventually, Gottsch provided Weyh a final accounting that included the 2014 crop year. The final accounting showed the entire farming operation generated net profits of $1,079,003.58. Included among the expenses of the farming operation were $2,130,657.21 in rent to Gottsch for land owned by him and farmed by the operation, and $208,452.64 in earnings paid to Kollars.

After Weyh received the final accounting from Gottsch, he amended his complaint to expressly accept the final accounting, with two exceptions: Weyh alleged that neither the $2,130,657.21 in accumulated rent to Gottsch nor the $208,452.64 in earnings paid to Kollars were properly expensed to the farming operation. The amended complaint sought a declaratory judgment to that effect and alleged separate theories of recovery for breach of contract, fraudulent misrepresentation, fraudulent concealment, unjust enrichment/constructive trust, money received and retained, and breach of the implied covenant of good faith and fair dealing. On each theory of recovery, Weyh's amended complaint sought recovery of his one-half share of the net profits plus prejudgment interest.

Gottsch filed an answer to the amended complaint and later was permitted to amend his answer. The amended answer admitted the parties had orally agreed to farm together and had agreed to share equally in the profits and losses of the farming operation. But Gottsch denied that Weyh was entitled

to recover the amount sought in the amended complaint, and he raised several affirmative defenses, including that Weyh's claims were time barred under Neb. Rev. Stat. §§ 25-211 and 25-212 (Reissue 2016).

### 3. Bench Trial

During the 3-day bench trial, the primary disputes were (1) whether Weyh's claims were time barred and (2) how to treat the two contested expenses: rent to Gottsch and earnings to Kollar. Both parties testified on these issues.

### (a) Weyh's Testimony

According to Weyh, he and Gottsch decided to farm together while they were standing on a hillside in 2004. At that time, they agreed Weyh would provide the farm labor and Gottsch would provide the land, the equipment, and the financial management. They agreed to share net profits equally, and they agreed to farm together "until we both decided to quit." Weyh testified they never agreed that Gottsch would be paid cash rent in addition to a share of the profits.

In the fall of 2014, Gottsch told Weyh he was ending the farming operation. After learning this, Weyh demanded a full accounting, and Gottsch agreed it was time to "settle up." Weyh claims Gottsch remarked at the time "I owe you so much money" and suggested that with the all the money he was owed, Weyh could start his own operation if he wanted to continue farming.

Once a final accounting was prepared, Weyh accepted it, with the exception of two expenses: $2,130,657.21 in rent to Gottsch and $208,452.64 in earnings paid to Kollars. According to Weyh, neither of these expenses were properly attributed to the farming operation.

Weyh testified that Gottsch never brought up the topic of rent until 2006, when they met to go over Gottsch's financial notes. During that 2006 meeting, Weyh noticed that Gottsch had listed, as a farm expense, rent to himself on the land he owned. Weyh told Gottsch that was not a proper farm expense

under their agreement, and Gottsch replied that "we'll figure it out." Weyh testified the two did not discuss rent again, and Weyh did not press the issue further. Weyh testified that when he and Gottsch farmed land owned by others, the farming operation entered into written lease agreements for cash rent, and that none of those agreements also included crop share.

Weyh also testified about a hunting operation he and Gottsch entered into in 2005, again pursuant to an oral agreement. Initially, they agreed Gottsch would contribute the property upon which hunts would take place, Weyh would serve as the hunting guide, and they would split net profits equally. Under that initial agreement, Gottsch did not charge rent for the use of his land. Later, they modified the agreement so that Weyh paid Gottsch cash rent for the use of his land, and Weyh retained 100 percent of the profits from the hunts. At no time during the operation of the parties' hunting business did Gottsch receive both cash rent and a share of the profits.

Weyh objected to expensing Kollars' earnings to the farming operation. According to Weyh, Gottsch hired Kollars in 2010 to take care of Gottsch's personal and rental properties, and at that time, Gottsch assured Weyh that Kollars' wages would not come out of the farming operation. Kollars performed work on Gottsch's cars and pool and several of Gottsch's properties. Over time, Gottsch asked Kollars to do maintenance work on some of the farming equipment too. Weyh objected to Kollars' working for the farming operation, as he did not think Kollars' help was needed. At some point, Kollars told Weyh that Gottsch had instructed him to charge at least 50 percent of his time to the farming operation. Weyh objected to that practice because he did not think Kollars was really working for the farm, and Kollars replied, "I only do what I'm told."

### (b) Gottsch's Testimony

According to Gottsch, when he and Weyh agreed to farm together, they also agreed that rent on Gottsch's land would be a farm expense. Gottsch did not dispute that he and Weyh

discussed farming together while they were on the hillside in 2004, but he thought the agreement on rent occurred during a later conversation at the "brown shop" sometime before the 2005 planting season. Gottsch admitted that his recollection of that conversation was vague, but he recalled telling Weyh he would "put up all the money and all the equipment" but "I got to charge rent." Gottsch testified that one of the reasons he started farming, and agreed to purchase all the equipment, was that he had sold his share of a family business and wanted to manage his capital gains exposure.

Gottsch testified that after the 2005, 2006, and 2007 crop years, he provided Weyh with some handwritten financial notes that listed, as a farm expense, rent on Gottsch's land. Gottsch did not recall that Weyh ever "confronted" him about including rent as an expense of the farming operation.

Gottsch testified that "just before the lawsuit" was filed, he hired an agronomist to help him set the cash rents for all of the prior farming years. At that time, he also modified the rents for the 2005, 2006, and 2007 crop years. Gottsch admitted that he never discussed the amount of rent with Weyh prior to any crop year and that Weyh had "zero" input on the amount of rent. Gottsch was not aware of any other farming operation where the landowner would get cash rent plus half the crop share, and he admitted it was common to agree in advance on the amount of rent so the farm tenant could decide whether to accept or reject the rent before the crop year. Gottsch admitted Weyh did not have such an opportunity before any of the crop years for which Gottsch was seeking rent.

Regarding the "draws" paid to Weyh, Gottsch testified there was no set schedule, interval, or timeframe for draws. Instead, Weyh would ask for a draw when he needed it and Gottsch would "just round it up to whatever I felt like would be good," because he knew Weyh "had money coming." Gottsch testified that the parties did not take stock of their profits and losses after each crop year and that they never agreed to settle up after each year. Gottsch admitted that he was "terrible

at settling up" and that when he decided to end the farming operation in the fall of 2014, he knew an accounting needed to be done for "the entirety of the operation."

In 2010, Gottsch hired Kollars to perform maintenance and repairs on Gottsch's various properties and vehicles. Gottsch also directed Kollars to do "some" work for the farming operation. When Gottsch informed Weyh that Kollars would be available to help with the farming operation, Weyh disapproved, because "he wanted his guys helping." Gottsch told Kollars to report his time directly to Wetzel, Gottsch's bookkeeper, and he denied that he ever instructed Kollars to attribute a certain amount of his time to the farming operation.

In 2014, Wetzel attributed most of Kollars' time to the farming operation. At trial, Gottsch admitted that was not correct. Gottsch testified that Kollars performed "some" work for the farm in 2014, but Gottsch did not think there was "any way he had that high of a percentage with the farm." Gottsch admitted that, other than what Kollars reported to Wetzel, he had no way of knowing what percentage of Kollars' time was attributable to the farming operation.

### (c) Bookkeeper's Testimony

In 2006, Wetzel began keeping the books for Gottsch's personal and business entities, including those related to the farming operation. Wetzel did not keep separate accounts for the farming operation and Gottsch's personal and other business affairs; all of Gottsch's financial information went into a single account for bookkeeping purposes, with separate classifications. Using a business software application, Wetzel would, as much as possible, enter "farm" expenses contemporaneously as they occurred. Sometimes she was provided information on expenses from Gottsch, and other times from Weyh. Wetzel described Weyh's recordkeeping practices as "pretty detailed" and Gottsch's as "[p]retty bad."

Wetzel testified that while the farming operation was ongoing, Gottsch never asked her to include rent on his land as a farm expense. It was not until the farming operation ended in

2014 that Gottsch made such a request, and at that time, he told Wetzel that when she prepared the final accounting, rent on the land he owned "needed to be part of that equation." In response, Wetzel made a list of all the property Gottsch owned "so he could establish what he wanted to charge for rent." Wetzel testified that after she prepared the accounting in early 2015, Gottsch was still "adjusting the rents that he thought he should charge on properties he owned."

According to Wetzel, Kollars began working for Gottsch in 2010 and all of Kollars' W-2 wage and tax statements listed Gottsch as the employer. Kollars was instructed by Gottsch to call or text Wetzel each week to report what percentage of his work was attributable to the farming operation and what percentage was attributable to Gottsch's other personal and business ventures. When Kollars did not contact Wetzel to report his percentages for the week, she would automatically attribute all of Kollars' time to the farming operation.

In 2014, Kollars gave Wetzel no information about how his work should be allocated, so Wetzel attributed all of Kollars' earnings as an expense of the farming operation. Wetzel's records also attributed a portion of Kollars' earnings in 2010 through 2013 to the farming operation, but the records did not include an hourly breakdown, and Wetzel had no personal knowledge of how much time Kollars actually devoted to the farming operation. From 2010 through 2014, the total amount of Kollars' earnings expensed to the farming operation was $208,452.64.

### 4. DISTRICT COURT'S FINDINGS

### (a) Claims Not Time Barred

The district court rejected Gottsch's contention that any of Weyh's claims were time barred. It found the parties intended the farming operation to be ongoing until one or both of them decided to end it, at which time they would settle up and divide net profits equally. The court found that while the farming operation was ongoing, the parties did not distribute "draws" on any regular basis and that there was no agreement to do

so. Nor was there any agreement to settle up after each crop year. The court thus reasoned that Weyh's claim for breach of contract did not accrue until late 2014, because that was the point at which the farming operation ended and it was time to settle up, and Gottsch failed to pay Weyh his share of the net profits. Because Weyh's suit against Gottsch was filed just a few months after the claim accrued, the court found it was not time barred.

### (b) Rent to Gottsch

On the issue of rent, the court stated "[t]he crux of the issue" was one of credibility, and it ultimately found "there was no credible evidence that the parties agreed [Gottsch] would charge rent for properties he owned that the farming operation farmed." The court reasoned the parties' course of conduct supported this finding, as it was undisputed that Gottsch unilaterally set the rent amounts for the majority of the farming years after the farming operation had ended and that Gottsch never sought input or agreement from Weyh on rent amounts during the course of the farming operation. The court thus concluded that rent to Gottsch was not part of the parties' oral agreement and, consequently, entered a declaratory judgment that rent to Gottsch was not a proper expense of the farming operation.

### (c) Kollars' Earnings

The court found the evidence did not support including Kollars' earnings as a farm expense. First, the court found the parties' oral agreement did not include expensing Kollars' earnings to the farming operation, finding it significant that Gottsch expressly told Weyh that Kollars' time would not be expensed to the farming operation. Additionally, the court found that neither Gottsch nor Wetzel had firsthand knowledge of how much of Kollars' work was actually devoted to the farming operation. That lack of knowledge, combined with admittedly incorrect information in the final accounting, left the court with "no way of knowing how many hours, if any,

. . . Kollars worked for the farming operation, as opposed to for [Gottsch] personally." The court found this failure of proof prevented Gottsch from claiming any portion of Kollars' earnings as a farm expense for any farming year, and entered a declaratory judgment that Kollars' earnings were not properly expensed to the farming operation.

### (d) Breach of Contract

The court found that Gottsch breached the parties' oral contract by failing to pay Weyh the full amounts owed to him when the operation ended and by providing an accounting that improperly listed rent to Gottsch and earnings to Kollars as expenses of the farming operation. Using the figures from Gottsch's final accounting that Weyh had accepted, the court found the farming operation's net profits were $3,418,113.45, and concluded Weyh was entitled to half this amount, less sums he had previously taken in "draws" over the years. Ultimately, the court determined Weyh was entitled to damages for breach of contract in the amount of $1,214,056.73. The court also found in Weyh's favor on several other theories of recovery and awarded identical damages under each theory.

### (e) Prejudgment Interest

Weyh's original and amended complaints sought prejudgment interest, and in closing argument, Weyh suggested he was entitled to prejudgment interest under either of two theories: because his claim was liquidated under § 45-103.02(2) or because his claim fit within those described in § 45-104. Gottsch opposed an award of prejudgment interest, arguing it was not recoverable either because Weyh's claim was not liquidated or because it would be too difficult to determine the date on which Weyh's entitlement to prejudgment interest accrued.

The district court concluded Weyh was entitled to prejudgment interest "in the amount of 12% per annum under Neb. Rev. Stat. § 45-104" and awarded $972,582.10 in prejudgment interest. The order does not explain how this amount

was calculated, but it is clear the court relied exclusively on § 45-104 in awarding prejudgment interest. It found that Weyh had met his burden of proof under § 45-104 by showing that Gottsch received, into his personal bank account, Weyh's share of the net profits from the farming operation and retained such sums after they should have been paid to Weyh. In addressing prejudgment interest, the court's order did not discuss § 45-103.02(2) or make any findings as to whether Weyh's claim was liquidated or unliquidated.

### (f) Appeal and Petition to Bypass

Gottsch timely appealed and moved to bypass the Nebraska Court of Appeals, arguing this case presents an important and unresolved issue of statutory interpretation regarding the recoverability of prejudgment interest under Nebraska law. Weyh agrees, and both parties seek clarification regarding whether all prejudgment interest awards must satisfy § 45-103.02, or whether an award of prejudgment interest may be based only on § 45-104.

In several prior appeals, parties have raised the issue of whether §§ 45-103.02(2) and 45-104 are separate and independent means of obtaining prejudgment interest or whether they are interrelated and, if so, how.[1] But until now, the issue has been presented in cases where the facts did not satisfy one or both statutes and, consequently, the tension between §§ 45-103.02(2) and 45-104 has not been directly addressed by this court.[2] We granted the petition to bypass to address that issue.

## II. ASSIGNMENTS OF ERROR

Gottsch assigns, consolidated and restated, that the district court erred in (1) finding the breach of contract claim accrued

---

[1] See, *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013); *Fitzgerald v. Community Redevelopment Corp.*, 283 Neb. 428, 811 N.W.2d 178 (2012); *BSB Constr. v. Pinnacle Bank*, 278 Neb. 1027, 776 N.W.2d 188 (2009).

[2] See *id.*

when the farming operation ended and was not time barred, (2) finding the parties had not agreed that rent to Gottsch or earnings to Kollars were proper expenses of the farming operation, (3) finding an agreement to charge rent on Gottsch's property would violate the statute of frauds, (4) relying on evidence of the parties' previous hunting operation, (5) excluding expert testimony offered by Gottsch, (6) finding in favor of Weyh on several other theories of recovery, (7) finding Weyh was entitled to prejudgment interest under § 45-104, and (8) improperly calculating prejudgment interest.

## III. STANDARD OF REVIEW

[1] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[3] But an appellate court independently reviews questions of law decided by a lower court.[4]

[2] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[5]

[3] An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.[6] When a dispute sounds in contract, the action is to be treated as one at law.[7] An appellate court treats the determination of factual issues in such a declaratory judgment action which was tried without a jury in the same manner as any other action at law; accordingly, the findings of the trial court

---

[3] *Donut Holdings v. Risberg*, 294 Neb. 861, 885 N.W.2d 670 (2016).

[4] *Id.*

[5] *Hike v. State*, 297 Neb. 212, 899 N.W.2d 614 (2017).

[6] *Wetovick v. County of Nance*, 279 Neb. 773, 782 N.W.2d 298 (2010).

[7] *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003).

have the effect of a verdict and will not be set aside unless clearly wrong.[8]

[4] Awards of prejudgment interest are reviewed de novo.[9]

[5] Statutory interpretation presents a question of law on which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[10]

## IV. ANALYSIS

### 1. Preliminary Issues

In addition to finding in favor of Weyh on the theory of breach of contract, the court found in Weyh's favor on several other theories and awarded identical damages under each. Gottsch's sixth assignment of error challenges the district court's findings with respect to the alternate theories of recovery, but it is not necessary to address that assignment, because, as we explain below, we affirm the district court's judgment on the breach of contract theory.[11] When addressing Gottsch's remaining assignments of error, we focus our analysis on the breach of contract theory.

### 2. Statute of Limitations for Breach of Contract

[6-8] An action upon an oral contract must be brought within 4 years from the date of the event giving rise to the cause of action.[12] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the

---

[8] See *Donaldson v. Farm Bureau Life Ins. Co.*, 232 Neb. 140, 440 N.W.2d 187 (1989).

[9] *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999).

[10] *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71 (2019).

[11] See *Woodmen of the World v. Nebraska Dept. of Rev.*, 299 Neb. 43, 907 N.W.2d 1 (2018) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

[12] Neb. Rev. Stat. § 25-206 (Reissue 2016).

decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[13] A cause of action in contract accrues at the time of breach or the failure to do the thing agreed to. This is so even though the nature and extent of damages may not be known.[14] Generally, a cause of action accrues and the period of limitations begins to run upon the violation of a legal right, that is, when the aggrieved party has the right to institute and maintain suit.[15]

Here, the district court found that Weyh's breach of contract claim accrued in late 2014 when the parties ended the farming operation, it was time to settle up, and Gottsch failed to pay Weyh his share of the net profits.

Gottsch argues the district court erred when it found Weyh's breach of contract claim was not time barred. He suggests that Weyh's cause of action for breach of contract accrued as early as 2006, when Gottsch provided Weyh the handwritten financial notes that included rent to Gottsch as a farm expense and arguably breached their oral agreement. Alternatively, he suggests that Weyh's claim accrued as early as 2008, when Weyh first requested an accounting and did not receive it. Gottsch argues that either or both of these events triggered the statute of limitations and that because Weyh did not file suit until 2014, his claim for breach of contract is time barred.

Gottsch's arguments presume that the parties' oral agreement (1) required Gottsch to perform an accounting after each farming year or whenever requested by Weyh and (2) required the parties, each year, to distribute net profits based on such accounting. But this characterization of the parties' agreement is not supported by either the record or the district court's factual findings.

---

[13] *Hike, supra* note 5.

[14] *Irving F. Jensen Co. v. State*, 272 Neb. 162, 719 N.W.2d 716 (2006).

[15] *Id.*

The court found the parties agreed to continue farming until one of them decided to end the operation, and it found their agreement did not require them to settle up at the end of each crop year. Implicit in these findings is recognition that the parties agreed to farm on a running account and to settle up when the operation ended. Substantial evidence in the record supports these findings, and we conclude they are not clearly wrong.

Because the parties' agreement did not require Gottsch to provide a yearly accounting or to distribute net profits after each crop year while the farming operation was ongoing, the district court did not err in finding Weyh's cause of action for breach of contract accrued in late 2014 when the farming operation ended and Weyh demanded a final accounting and payment of his share of the profits. Shortly thereafter, when Gottsch provided an accounting that included expenses Weyh claimed were outside their agreement, and then failed to pay Weyh the profits he was owed, Weyh's claim for breach of the oral contract accrued and the limitations period began to run. Weyh filed this action in December 2014, well within the applicable statute of limitations. Gottsch's first assignment of error is without merit.

### 3. RENT TO GOTTSCH

Gottsch's second, third, fourth, and fifth assignments of error each pertain to the trial court's finding that the parties' oral agreement did not include rent to Gottsch. We find no merit to any of these assignments.

### (a) Rent to Gottsch Not Part of Oral Agreement

[9,10] The disputed terms of an oral agreement are questions of fact,[16] and in a bench trial of a law action, the trial court's

---

[16] See, *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005); *Edward Peterson Co. v. Ulysses S. Schlueter Constr. Co.*, 179 Neb. 883, 140 N.W.2d 830 (1966) (where evidence as to terms of oral contract is conflicting, it presents question of fact for jury).

factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[17] Additionally, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.[18]

The district court found no credible evidence the parties had agreed that the farming operation would pay rent to Gottsch on land he owned. Further, the district court found the parties' course of conduct demonstrated there was no agreement to pay rent to Gottsch,[19] noting the evidence was undisputed that (1) Gottsch never asked his bookkeeper to include rent as an expense while the farming operation was ongoing; (2) Gottsch unilaterally set the rent amounts after the crop year, and after the entire farming operation ended, without ever seeking input or agreement from Weyh; and (3) when the farming operation entered into lease agreements with third parties, it agreed to pay cash rent and never agreed to crop share in addition thereto.

Based on these factual findings, the district court entered a declaratory judgment that the parties' oral agreement did not include rent on Gottsch's property and that rent was not a proper expense of the farming operation. To the extent Gottsch's second assignment of error challenges these findings, we conclude they are not clearly wrong and will not be disturbed on appeal.

In his third assignment of error, Gottsch challenges the district court's alternative finding that an oral agreement to pay rent to Gottsch would have violated the statute of frauds. Because we find no error in the district court's finding that rent to Gottsch was not part of the parties' oral agreement, it

---

[17] See *Donut Holdings, supra* note 3.

[18] *In re Estate of Etmund*, 297 Neb. 455, 900 N.W.2d 536 (2017).

[19] See, generally, *Tilt-Up Concrete v. Star City/Federal*, 255 Neb. 138, 582 N.W.2d 604 (1998).

is not necessary to address the assignment of error challenging the court's alternative analysis regarding rent.[20]

### (b) Evidence of Hunting Operation

In his fourth assignment, Gottsch contends the court erred in considering evidence of the parties' hunting operation. He argues the hunting operation was so different from the farming operation that the court should not have relied on evidence of the hunting operation at all. This is essentially an argument that evidence of the hunting operation was irrelevant and thus inadmissible. But Gottsch did not object to the admission of this evidence at trial and thus has waived that argument.[21]

To the extent Gottsch's argument turns instead on the weight given to such evidence, it also fails. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.[22] We find no merit to Gottsch's fourth assignment of error.

### (c) Exclusion of Expert Testimony

In his fifth assignment of error, Gottsch argues the district court erred in excluding expert testimony from Richard Hickman. Hickman was described as an "expert in the area of land leases" who "does leases and negotiations for farming operations." At trial, Gottsch made an offer of proof that, if permitted, Hickman would have testified that based on his financial calculations, Gottsch was assuming most of the risk of the farming operation, while Weyh assumed very little. Gottsch sought to offer Hickman's testimony to show it was reasonable

---

[20] See *Woodmen of the World, supra* note 11.

[21] See, *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010); *Allphin v. Ward*, 253 Neb. 302, 570 N.W.2d 360 (1997).

[22] *In re Estate of Etmund, supra* note 18.

for him to include rent to himself as a farm expense. Weyh objected to the admission of Hickman's testimony on grounds it was irrelevant and unduly prejudicial, and the district court excluded the testimony.

[11,12] Generally, an appellate court reviews a trial court's decision to exclude expert testimony for an abuse of discretion.[23] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[24]

Having reviewed the record, we find no abuse of discretion in excluding Hickman's testimony, whether or not it is characterized as expert testimony. The proffered evidence was cumulative, because the court already had, in the profit-and-loss statement, all the numbers necessary to make the mathematical calculations to which Hickman would have testified if permitted. The exclusion of cumulative evidence is not prejudicial to a litigant and generally is not an abuse of discretion.[25]

Moreover, we find no merit to Gottsch's arguments that exclusion of the evidence resulted in prejudice to him. He argues the evidence was crucial to understanding why rent to him "should be included"[26] in the parties' agreement. But the district court was not tasked with determining what the parties should have agreed to, it was tasked with determining what the parties actually agreed to. We find no merit to Gottsch's fifth assignment of error.

### 4. KOLLARS' EARNINGS

Gottsch's second assignment of error challenges the district court's finding that Kollars' earnings were not a proper

---

[23] See *Freeman v. Hoffman-La Roche, Inc.*, 300 Neb. 47, 911 N.W.2d 591 (2018).

[24] *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015); *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015).

[25] See *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017).

[26] Brief for appellant at 26.

expense of the farming operation. This factual finding was based in part on evidence that Gottsch expressly told Weyh that Kollars' time would not be expensed to the farming operation, and in part was based on a failure of proof as to how much of Kollars' work was actually devoted to the farming operation during any farming year. As already explained, we will not disturb these factual findings unless they are clearly wrong.[27]

On the record before us, we conclude the district court's findings regarding Kollars' earnings were not clearly wrong. There is no merit to this assignment of error.

### 5. AWARD OF PREJUDGMENT INTEREST

In his seventh assignment of error, Gottsch argues the district court erred in awarding Weyh prejudgment interest under § 45-104. In Nebraska, there are two statutes that authorize recovery of prejudgment interest. The first, § 45-104, was enacted in 1879, and the second, § 45-103.02, was enacted in 1986 and amended in 1994.

Since its adoption more than a century ago, § 45-104 has identified four types of claims—all contract based—under which prejudgment interest is allowed. When the Legislature enacted § 45-103.02 in 1986, it expanded the recovery of prejudgment interest to other types of claims too. The proper harmonization of §§ 45-103.02 and 45-104 lies at the center of this assignment of error. We begin with the plain language of each statute.

Section 45-104 provides:

Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by

---

[27] See *Donut Holdings, supra* note 3.

unreasonable delay of payment. Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

Section 45-103.02 currently provides:

(1) Except as provided in section 45-103.04, interest as provided in section 45-103 shall accrue on the unpaid balance of unliquidated claims from the date of the plaintiff's first offer of settlement which is exceeded by the judgment until the entry of judgment if all of the following conditions are met:

(a) The offer is made in writing upon the defendant by certified mail, return receipt requested, to allow judgment to be taken in accordance with the terms and conditions stated in the offer;

(b) The offer is made not less than ten days prior to the commencement of the trial;

(c) A copy of the offer and proof of delivery to the defendant in the form of a receipt signed by the party or his or her attorney is filed with the clerk of the court in which the action is pending; and

(d) The offer is not accepted prior to trial or within thirty days of the date of the offer, whichever occurs first.

(2) Except as provided in section 45-103.04, interest as provided in section 45-104 shall accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment.

Weyh's amended complaint sought recovery of prejudgment interest on the breach of contract claim and asked that such interest be calculated from the date his share of the net profits should have been distributed.[28] In his closing argument, Weyh claimed entitlement to prejudgment interest under

---

[28] See Neb. Ct. R. Pldg. § 6-1108(a) (when interest on demand for recovery of money is claimed, "the time from which interest is to be computed shall also be stated").

either § 45-103.02(2) or § 45-104. The district court awarded prejudgment interest under § 45-104, reasoning that over the course of the farming operation, Gottsch received Weyh's share of the net proceeds and retained it in his personal bank accounts, and that once the farming operation ended and a final accounting was completed, Gottsch continued to retain Weyh's share of the profits without Weyh's consent. The court did not address § 45-103.02(2) or discuss whether the claim was liquidated.

On appeal, Gottsch contends the district court erred in awarding prejudgment interest under § 45-104. He advances several arguments, all premised on the theory that once § 45-103.02 was enacted, it became the exclusive means to recover prejudgment interest in Nebraska. Alternatively, Gottsch argues that to recover prejudgment interest, Weyh had to prove both that his claim was the type described in § 45-104 and that his claim was liquidated under § 45-103.02.

Weyh, on the other hand, argues that this court has not yet squarely addressed the interplay between §§ 45-103.02(2) and 45-104, and he urges a construction that gives continuing effect to the plain language of both statutes. He asks us to hold that §§ 45-103.02 and 45-104 provide alternate methods for recovering prejudgment interest, and he suggests that nothing in the statutory language or legislative history of § 45-103.02 indicates it was intended to be the exclusive or preferred means for recovering prejudgment interest.

The unresolved tension between §§ 45-103.02(2) and 45-104 is central to the parties' arguments, and they are not the first litigants to grapple with the issue.[29] Resolving that tension requires that we recognize, and reconcile, competing and contradictory lines of authority in our own jurisprudence.

We begin with an overview of our case law on prejudgment interest before the adoption of § 45-103.02. We then discuss

---

[29] See, e.g., cases cited *supra* note 1; *Farm & Garden Ctr. v. Kennedy*, 26 Neb. App. 576, 921 N.W.2d 615 (2018) (petition for further review denied January 23, 2019).

the adoption and amendment of § 45-103.02 and consider the relevant legislative history. Finally, after summarizing our more recent cases on prejudgment interest, we address the parties' arguments on the proper construction of §§ 45-103.02 and 45-104.

### (a) § 45-104

Long ago, this court observed, "The collection of interest is a statutory right, and did not exist at common law."[30] For more than a century, § 45-104 was the only statute authorizing the recovery of prejudgment interest in Nebraska. Yet, there are surprisingly few appellate decisions construing or analyzing the categories described in § 45-104. In fact, before 1994, most of this court's opinions addressing prejudgment interest did not even mention § 45-104.

During that period, the overwhelming majority of our opinions addressing prejudgment interest focused exclusively on whether the plaintiff had presented a "liquidated claim" as that term was defined by this court, and did not mention § 45-104 at all.[31] Occasionally, our opinions would cite § 45-104 for the applicable interest rate, but would still decide the availability of prejudgment interest by analyzing only whether the claim was

---

[30] *Wittenberg v. Mollyneaux*, 59 Neb. 203, 206, 80 N.W. 824, 825 (1899).

[31] See, *A.G.A. Inc. v. First Nat. Bank*, 239 Neb. 74, 474 N.W.2d 655 (1991); *Otto Farms v. First Nat. Bank of York*, 228 Neb. 287, 422 N.W.2d 331 (1988); *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *Aetna Cas. & Surety Co. v. Nielsen*, 217 Neb. 297, 348 N.W.2d 851 (1984), *overruled on other grounds, First Nat. Bank v. Bolzer*, 221 Neb. 415, 377 N.W.2d 533 (1985); *Land Paving Co. v. D. A. Const. Co.*, 215 Neb. 406, 338 N.W.2d 779 (1983); *Classen v. Becton, Dickinson & Co.*, 214 Neb. 543, 334 N.W.2d 644 (1983); *Fleming Realty & Ins., Inc. v. Evans*, 199 Neb. 440, 259 N.W.2d 604 (1977); *Frank McGill, Inc. v. Nucor Corp.*, 195 Neb. 448, 238 N.W.2d 894 (1976); *K & R, Inc. v. Crete Storage Corp.*, 194 Neb. 138, 231 N.W.2d 110 (1975); *Northwestern Bell Tel. Co. v. Woodmen of the World Life Ins. Soc.*, 189 Neb. 30, 199 N.W.2d 729 (1972); *National Fire Ins. Co. v. Evertson*, 157 Neb. 540, 60 N.W.2d 638 (1953); *McKain v. Platte Valley Public Power and Irrigation District*, 151 Neb. 497, 37 N.W.2d 923 (1949); *Wittenberg, supra* note 30.

liquidated.[32] Because the plain language of § 45-104 has never included the term "liquidated," this line of cases is best understood as having applied a traditional common-law rule allowing the recovery of interest as damages on liquidated claims,[33] rather than applying the statutory categories of § 45-104.

In a second line of cases, we analyzed the availability of prejudgment interest by examining two factors: whether the claim was liquidated and whether the claim fell within one of the categories described in § 45-104.[34] And in a third line of cases, we analyzed the availability of prejudgment interest by applying the categories described in § 45-104 without considering whether the claim was also liquidated.[35]

Until now, we have not discussed or attempted to reconcile these competing lines of authority.

### (b) § 45-103.02

In 1986, the Legislature considered two separate bills seeking to establish a method for recovering prejudgment interest in tort cases,[36] but only one bill advanced to general file.[37] As originally introduced, L.B. 298 merely updated the rate of "interest on all decrees and judgments" in Neb. Rev. Stat. § 45-103 (Reissue 1984). In other words, the original

---

[32] See, *Knox v. Cook*, 233 Neb. 387, 446 N.W.2d 1 (1989); *Graff v. Burnett*, 226 Neb. 710, 414 N.W.2d 271 (1987); *Bolzer, supra* note 31; *Church of the Holy Spirit v. Bevco*, 215 Neb. 299, 338 N.W.2d 601 (1983); *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982); *Abbott v. Abbott*, 188 Neb. 61, 195 N.W.2d 204 (1972).

[33] See, 1 Dan B. Dobbs, Dobbs Law of Remedies § 3.6(1) (2d ed. 1993); Charles T. McCormick, Handbook on the Law of Damages § 51 (1935).

[34] See, *Lease Northwest v. Davis*, 224 Neb. 617, 400 N.W.2d 220 (1987); *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984).

[35] *City of Bellevue v. Western Surety Co.*, 184 Neb. 678, 171 N.W.2d 772 (1969); *Fraser v. Temple*, 173 Neb. 367, 113 N.W.2d 319 (1962); *Murphy v. City of Omaha*, 33 Neb. 402, 50 N.W. 265 (1891).

[36] See 1986 Neb. Laws, L.B. 1232 and L.B. 298.

[37] See L.B. 298, § 3.

bill related only to the rate of postjudgment interest. But it was amended on the floor to authorize recovery of judgment interest *before* the rendition of judgment when certain conditions were met. The amendment passed and was codified at § 45-103.02.

As adopted, § 45-103.02 applied to "all causes of action accruing on or after January 1, 1987" and provided in relevant part:

> [J]udgment interest shall also accrue on decrees and judgments for the payment of money from the date of the plaintiff's first offer of settlement which is exceeded by the judgment until the rendition of judgment if all of the following conditions are met:
>
> (1) The offer is made in writing upon the defendant by certified mail, return receipt requested, to allow judgment to be taken in accordance with the terms and conditions stated in the offer;
>
> (2) The offer is made not less than ten days prior to the commencement of the trial;
>
> (3) A copy of the offer and proof of delivery to the defendant in the form of a receipt signed by the party or his or her attorney is filed with the clerk of the court in which the action is pending; and
>
> (4) The offer is not accepted prior to trial or within thirty days of the date of the offer, whichever occurs first.[38]

The legislative history indicates the purpose of § 45-103.02 was to encourage settlement of tort cases by authorizing the recovery of prejudgment interest when a reasonable settlement demand was refused. But the language of § 45-103.02 as originally enacted was quite broad, and in *Knox v. Cook*,[39] this court construed the statutory preconditions in § 45-103.02 to apply to all claims for prejudgment interest.

---

[38] *Id.*

[39] *Knox, supra* note 32.

*Knox* was an action to recover on a personal guaranty for monthly rent payments. In addition to seeking past-due rent payments, the plaintiffs sought prejudgment interest on the basis that their claim was liquidated. This court agreed the claim for past-due rent was liquidated, but in *Knox*, we construed the plain language of § 45-103.02 to govern all claims for prejudgment interest accruing after January 1, 1987, regardless of whether the claim was liquidated or unliquidated. Because the plaintiff had not complied with the preconditions of § 45-103.02, *Knox* reasoned that no prejudgment interest could be recovered on past-due rent accruing after the effective date of § 45-103.02. However, *Knox* allowed the plaintiff to recover prejudgment interest on past-due rent which had accrued during the 13-month period before § 45-103.02 went into effect, citing to our general rule that "'[p]rejudgment interest is allowed where the amount of the claim is liquidated.'"[40]

The dissenting opinion in *Knox*, in which two justices joined, cautioned against construing § 45-103.02 to preclude recovery of prejudgment interest under § 45-104:

> I dissent from that part of the majority opinion that seems to hold that compliance with Neb. Rev. Stat. § 45-103.02 (Reissue 1988) is a prerequisite to the recovery of prejudgment interest in all situations. *Rather, I would hold that the section is an addition to those cases where prejudgment interest is allowed pursuant to Neb. Rev. Stat. § 45-104 (Reissue 1988)*.
>
> The application of the conditions in § 45-103.02, specifically that of a greater recovery than demanded, will result in denial of justified prejudgment interest. If one demands a delinquent payment [in contract] and subsequently sues and recovers a judgment for the delinquent payment, prejudgment interest must be denied, since plaintiff's first offer of settlement is "[not] exceeded by the judgment."

---

[40] *Id*. at 394, 446 N.W.2d at 5.

The result, I submit, is contrary to the plain intent of the statute, i.e., to encourage settlements, not to offer a boon to deadbeats.[41]

Eight years later, the Legislature amended § 45-103.02 via 1994 Neb. Laws, L.B. 1183. Its stated goal in doing so was to overrule *Knox*.[42]

L.B. 1183 sought to overrule *Knox* by creating two subsections: one authorizing prejudgment interest on "unliquidated claims" and the other authorizing prejudgment interest on "liquidated claims." L.B. 1183 did not expressly define either term, but both are well defined in our case law.[43]

Subsection (1) retained all the procedural preconditions of § 45-103.02 as it was originally enacted, but made them applicable only to "unliquidated claims." On such claims, prejudgment interest accrued at the rate established in § 45-103, from the date of the first settlement offer which is exceeded by the judgment to the entry of judgment.

Subsection (2) of § 45-103.02 added new provisions related exclusively to the recovery of prejudgment interest on the unpaid balance of "liquidated claims." On such claims, prejudgment interest accrued "as provided in section 45-104," from the date the cause of action arose to the entry of judgment.

L.B. 1183 did not expressly repeal or amend § 45-104. But Gottsch argues that when the Legislature amended § 45-103.02

---

[41] *Id*. at 395-96, 446 N.W.2d at 6 (emphasis supplied) (White, J., dissenting; Boslaugh and Fahrnbruch, JJ., join).

[42] Committee on Banking, Commerce and Insurance Hearing, L.B. 1183, 93d Leg., 2d Sess. 64 (Feb. 8, 1994).

[43] See, e.g., *Brook Valley Ltd. Part., supra* note 1, 285 Neb. at 172-73, 825 N.W.2d at 792 (holding claim is liquidated "when there is no reasonable controversy as to both the amount due and the plaintiff's right to recover"); *Jacob v. Schlictman*, 16 Neb. App. 783, 792-93, 753 N.W.2d 361, 370 (2008) (holding where "reasonable controversy exists as to the plaintiff's right to recover or as to the amount of such recovery, the claim is considered to be unliquidated").

via L.B. 1183, it intended to establish § 45-103.02 as the exclusive procedure for recovering prejudgment interest in Nebraska. Weyh disagrees and argues that when the Legislature enacted and amended § 45-103.02, it intended to authorize additional ways to recover prejudgment interest, but did not intend to affect the existing method for recovering prejudgment interest under § 45-104. To the extent it informs this debate over legislative intent, we summarize the legislative history of L.B. 1183.[44]

The Committee on Banking, Commerce and Insurance held a hearing on L.B. 1183 in February 1994. During that hearing, senators repeatedly referred to the existing "case law" on the issue of prejudgment interest and liquidated claims, but they made no reference at all to § 45-104 or its statutory categories.[45] Testimony from the committee hearing indicates the Legislature understood the law prior to *Knox* to be "you get prejudgment interest at the statutory rate on liquidated claims."[46] At one point during the committee hearing, an attorney testified that the purpose of the 1994 amendment was to put "in statute what prior to 1986 was in case law."[47] And a senator explained that before 1986, the case law defined what a liquidated claim was, and "we had statutes to set the interest rate."[48]

These comments demonstrate an awareness of the primary line of cases from this court applying a traditional "liquidated claim" standard. However, senators did not mention the statutory categories in § 45-104 or the line of cases applying those

[44] See *State v. McColery*, 301 Neb. 516, 919 N.W.2d 153 (2018) (appellate court can examine act's legislative history if statute is ambiguous or requires interpretation).

[45] Committee on Banking, Commerce and Insurance Hearing, L.B. 1183, 93d Leg., 2d Sess. 64-71 (Feb. 8, 1994).

[46] *Id*. at 64.

[47] *Id*. at 71.

[48] *Id*. at 67.

categories without analyzing whether the claim was liquidated. The Legislature was clearly aware § 45-104 existed, because it expressly incorporated the interest rate from § 45-104 into § 45-103.02(2). But we see no indication in the legislative history that the Legislature considered the categories in § 45-104 to be relevant to the discussion of prejudgment interest on liquidated claims under § 45-103.02(2).

The Legislative history on L.B. 1183, summarized, indicates the singular focus of amending § 45-103.02 in 1994 was to overrule *Knox*.[49] According to the floor debate, L.B. 1183 was intended to "return[] us back to the state of affairs that would have pertained before <u>Knox v. Cook</u>."[50] The Legislature did so by clarifying that the statutory preconditions set out in § 45-103.02(1) govern the recoverability of prejudgment interest only when a claim is unliquidated. Subsection (2) governs the recovery of prejudgment interest on liquidated claims and contains no preconditions. The notable absence of any discussion in the legislative history of the contract-based categories in § 45-104 suggests the Legislature did not think L.B. 1183 had any effect on those statutory categories. With minor language adjustments, § 45-103.02 has remained the same since 1994.

### (c) Post-1994 Cases

On several occasions after § 45-103.02 was amended in 1994, this court adhered to the proposition first announced in *Knox* that prejudgment interest may be awarded only pursuant to § 45-103.02.[51] None of these cases discussed whether § 45-104 remained a viable alternate means to recover prejudgment interest.

---

[49] See *id*. at 64.

[50] Floor Debate, Committee on Banking, Commerce and Insurance, 93d Leg., 2d Sess. 9954 (Mar. 3, 1994) (Senator Bob Wickersham).

[51] See, e.g., *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015); *Travelers Indemnity Co. v. International Nutrition*, 273 Neb. 943, 734 N.W.2d 719 (2007); *Blue Valley Co-op, supra* note 9.

In another line of cases, we analyzed the recoverability of prejudgment interest by considering both § 45-103.02(2) and § 45-104,[52] and we affirmed the award of prejudgment interest only when the claim was the type described in § 45-104 and was also liquidated under § 45-103.02(2).[53] The Court of Appeals recently followed a similar approach in affirming an award of prejudgment interest.[54]

Not surprisingly, litigants continue to debate whether § 45-103.02 is the exclusive means to recover prejudgment interest, whether §§ 45-104 and 45-103.02 authorize separate ways to recover prejudgment interest, and whether both § 45-103.02(2) and § 45-104 must be satisfied to recover prejudgment interest on a liquidated claim.[55] Several prior cases raised questions about the proper framework for analyzing prejudgment interest under §§ 45-103.02(2) and 45-104, but it was not necessary in those cases to answer the question, because the claims did not satisfy either § 45-103.02(2) or § 45-104.[56] As we explained in a 2013 case:

The parties dispute the proper legal framework for addressing the award of prejudgment interest. The appellants contend that §§ 45-103.02 and 45-104 are not alternate routes to recover prejudgment interest, but that the [liquidated claim requirement of § 43-403.02(2)] must be met regardless whether the case is a type enumerated in § 45-104. The [appellees], on the other hand, contend that §§ 45-103.02 and 45-104 are alternate routes to recover prejudgment interest and that if the case is a

[52] See, e.g., *Cheloha v. Cheloha*, 255 Neb. 32, 582 N.W.2d 291 (1998); *Daubman v. CBS Real Estate Co.*, 254 Neb. 904, 580 N.W.2d 552 (1998).

[53] *Id.*

[54] *Farm & Garden Ctr. v. Kennedy*, 26 Neb. App. 576, 921 N.W.2d 615 (2018).

[55] See, e.g., cases cited *supra* note 1.

[56] See, *Fitzgerald, supra* note 1; *BSB Constr., supra* note 1.

type enumerated in § 45-104, whether [it is liquidated] is irrelevant.

We see no need to resolve this issue because we conclude this case is not a type enumerated under § 45-104. So regardless which approach is correct, whether prejudgment interest is proper depends on whether this case presented a [liquidated claim under § 45-103.02(2)].[57]

The instant case, however, allows us to resolve the debate over whether §§ 45-103.02 and 45-104 provide alternate routes to recover prejudgment interest, because Weyh's claim is the type described in § 45-104, and Gottsch does not contend otherwise.

Section 45-104 applies to four types of judgments: (1) money due on any instrument in writing; (2) settlement of the account from the day the balance shall be agreed upon; (3) money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof; and (4) money loaned or due and withheld by unreasonable delay of payment.[58]

We agree with the district court that Weyh proved a claim under § 45-104 for money received to the use of another and retained without the owner's consent. The evidence showed that Gottsch received, in his personal bank account, Weyh's share of the net profits from the farming operation and retained such sums without Weyh's consent after the farming operation ended.

### (d) Framework for Prejudgment Interest Under §§ 45-103.02(2) and 45-104

As noted, in arguing the district court erred in awarding prejudgment interest under § 45-104, Gottsch presents two related arguments. First, he argues that § 45-103.02 is the exclusive means for recovering prejudgment interest and

---

[57] *Brook Valley Ltd. Part., supra* note 1, 285 Neb. at 171, 825 N.W.2d at 791.

[58] See *Brook Valley Ltd. Part., supra* note 1.

that recovery cannot be premised exclusively on § 45-104. Alternatively, he argues that to recover prejudgment interest, Weyh must satisfy both § 45-103.02 and § 45-104. We reject both arguments.

[13,14] When an appellate court construes statutes relating to the same subject matter, it should do so in a manner that maintains a sensible and consistent scheme and gives effect to every statutory provision.[59] It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.[60]

After considering the plain language of the relevant statutes and reviewing our multiple lines of cases and the legislative history, we expressly disapprove of our prior cases holding or implying that § 45-103.02 is the exclusive means of recovering prejudgment interest in Nebraska.[61] Nothing in the plain language of § 45-103.02, and nothing in the relevant Legislative history, supports such a conclusion. To the contrary, the Legislative history suggests the adoption and amendment of § 45-103.02 were not intended to have any effect on the substantive provisions of § 45-104.

[15] We now hold that §§ 45-103.02 and 45-104 are alternate and independent statutes authorizing the recovery of

---

[59] See *TracFone Wireless v. Nebraska Pub. Serv. Comm.*, 279 Neb. 426, 778 N.W.2d 452 (2010).

[60] *In re Estate of Fuchs*, 297 Neb. 667, 900 N.W.2d 896 (2017).

[61] *Roskop Dairy, supra* note 51; *Countryside Co-op v. Harry A. Koch Co.*, 280 Neb. 795, 790 N.W.2d 873 (2010); *Travelers Indemnity Co., supra* note 51; *Blue Valley Co-op, supra* note 9; *Cheloha, supra* note 52; *Daubman, supra* note 52; *Pantano v. McGowan*, 247 Neb. 894, 530 N.W.2d 912 (1995); *Label Concepts v. Westendorf Plastics*, 247 Neb. 560, 528 N.W.2d 335 (1995); *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994); *Peterson v. Kellner*, 245 Neb. 515, 513 N.W.2d 517 (1994); *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993); *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990); *Knox, supra* note 32.

prejudgment interest. In other words, the Legislature has created three separate ways to recover prejudgment interest, and none is preferred. Section 45-103.02(1) authorizes the recovery of prejudgment interest on unliquidated claims when the statutory preconditions are met, § 45-103.02(2) authorizes the recovery of prejudgment interest on liquidated claims, and § 45-104 authorizes the recovery of prejudgment interest on four categories of contract-based claims without regard to whether the claim is liquidated or unliquidated.

All three of these statutory provisions establish different criteria for the recovery of prejudgment interest, and none makes the recovery of prejudgment interest contingent on proof of another. We thus disapprove of our prior cases that allowed prejudgment interest only if § 45-104 was satisfied and the claim was also liquidated,[62] and we reject Gottsch's argument that Weyh can only recover prejudgment interest under § 45-104 if he also proves his claim was liquidated under § 45-103.02(2).

[16] Finally, although Weyh and Gottsch disagree about whether Weyh's claim is liquidated as that term is defined in our case law, we do not reach that question. Section 45-104 contains no requirement that the claims described therein must also be liquidated in order to recover prejudgment interest, and it never has. We expressly approve our prior line of cases applying the substantive provisions of § 45-104 without considering whether the claim was liquidated,[63] and we reject Gottsch's argument to the contrary. For the sake of completeness, we see no need to approve or disapprove the line of cases in which we substituted a traditional liquidated claim rule for the substantive provisions of § 45-104. When the Legislature adopted § 45-103.02(2) in 1994, it effectively codified that line of cases.

---

[62] See cases cited *supra* note 34.

[63] See cases cited *supra* note 35.

We thus agree that Weyh was entitled to an award of pre-
judgment interest under § 45-104 without regard to whether
his claim was liquidated. Gottsch's seventh assignment of error
has no merit.

### 6. Calculating Prejudgment Interest

In his final assignment of error, Gottsch argues that even
if Weyh is entitled to an award of prejudgment interest under
§ 45-104, the amount awarded by the district court was errone-
ous. Based on our de novo review,[64] we agree, and we recalcu-
late the award accordingly.

The district court's order awarded prejudgment interest of
$972,582.10 "as of October 31, 2017" (date of closing argu-
ment), but did not identify the date prejudgment interest com-
menced or provide analysis of how prejudgment interest was
calculated. We consider each issue in turn.

### (a) Start Date

The district court found that after the farming operation
ended and it was time to settle up, Gottsch retained Weyh's
share of the net profits without Weyh's consent. Consequently,
the court applied that portion of § 45-104 which allows pre-
judgment interest "on money received to the use of another
and retained without the owner's consent." Section 45-104
provides that on such a claim, prejudgment interest runs "from
the receipt thereof." In construing this provision, we have held
that interest is chargeable at the statutory rate "from the time
that the money is wrongfully withheld."[65]

Based on the amount of prejudgment interest awarded, the
district court appears to have awarded interest beginning some-
time before 2014. But under the parties' agreement, Gottsch
was not required to settle up until the farming operation ended.
In other words, the parties generally agreed to operate on a

---

[64] See *Blue Valley Co-op, supra* note 9.

[65] *Cheloha, supra* note 52, 255 Neb. at 43, 582 N.W.2d at 300.

running account until such time as the farming operation was terminated. Consequently, Gottsch could not have retained Weyh's money without his consent until after the farming operation ended and it was time to settle up and distribute Weyh's share of the net profits.[66]

But the record here does not identify that date with precision. There was evidence that Weyh demanded a final accounting in a letter dated October 15, 2014, but he did not also demand final distribution in that letter. Because we have not been directed to evidence of any earlier date on which Weyh demanded distribution of his share of the net profits, we use the date Weyh filed his initial complaint, December 4, 2014, as the date on which prejudgment interest began to accrue under § 45-104.

(b) End Date

The trial court ended prejudgment interest on the date the parties delivered closing arguments and the case was taken under advisement, rather than on the date judgment was entered. Section 45-104 identifies the accrual date, but unlike § 45-103.02, § 45-104 does not expressly provide that such interest stops accruing when judgment is entered. However, the statute governing postjudgment interest compels such a construction.

[17] Postjudgment interest is governed by Neb. Rev. Stat. § 45-103.01 (Reissue 2010) and provides that such interest begins to accrue "from the date of entry of judgment." Construing § 45-103.01 and § 45-104 together, we hold that prejudgment interest under § 45-104 ends, and postjudgment interest begins, on the date of entry of judgment. Here, judgment was entered on January 31, 2018, and that is the proper end date for an award of prejudgment interest under § 45-104.

---

[66] See 25 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 66:112 (4th ed. 2002) (on running account, prejudgment interest will not run until balance is struck and demand is made).

## (c) Calculation

The district court determined that Gottsch owed Weyh net profits of $1,214,056.73. Under § 45-104, prejudgment interest on that amount is chargeable at the rate of 12 percent per annum from the date the profits were wrongfully withheld (December 4, 2014), to the entry of judgment on January 31, 2018. We therefore modify the prejudgment interest awarded to $460,210.66 ($1,214,056.73 × 12 percent × 1,153 days ÷ 365 days per year).

We therefore find that Weyh is entitled to $460,210.66 in prejudgment interest, and modify the award accordingly.

## V. CONCLUSION

Weyh's cause of action for breach of contract did not accrue until October 2014, and the district court correctly found the action was not time barred. Further, the district court did not err in finding that neither rent to Gottsch nor Kollars' salary was properly included as expenses of the farming operation. The court's award of damages to Weyh in the sum of $1,214,056.73 is affirmed.

Prejudgment interest was properly awarded pursuant to § 45-104, but was incorrectly calculated. We modify the amount of prejudgment interest to $460,210.66, and affirm the judgment as modified.

Affirmed as modified.