IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

OLLIS V. AMBASSADOR REAL ESTATE CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DOYLE OLLIS, APPELLEE AND CROSS-APPELLANT,

V.

AMBASSADOR REAL ESTATE COMPANY, DOING BUSINESS AS BERKSHIRE HATHAWAY
HOME SERVICES AMBASSADOR REAL ESTATE, APPELLANT AND CROSS-APPELLEE.

Filed June 1, 2021.   No. A-20-564.

Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Affirmed in part, and in part reversed.

Douglas W. Ruge for appellant.

Kristopher J. Covi, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellee.

RIEDMANN, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Ambassador Real Estate Co. (Ambassador) appeals from an order of the Douglas County District Court finding that Ambassador breached its Independent Contractors Agreement with Doyle Ollis, a real estate agent with Ambassador, and awarding Ollis $11,880 in commissions due. Ollis filed a cross-appeal asserting the district court erred by not awarding him $13,700 in damages and not awarding him prejudgment interest. For the reasons set forth herein, we affirm in part, and in part reverse.

## STATEMENT OF FACTS

In 2006, Ollis, a licensed real estate agent, entered into a Real Estate Broker-Salesperson Contract (Broker-Salesperson Contract) with CBSHOME Real Estate (CBSHOME) wherein Ollis

agreed to serve as a "salesperson" for CBSHOME pursuant to the terms and conditions of the contract. The contract specified that Ollis would be considered an independent contractor of CBSHOME; that CBSHOME would make its listings available to Ollis; that Ollis would use his best efforts to sell real estate listed with CBSHOME while seeking additional listings for them; that Ollis would abide by applicable laws and regulations; that Ollis would be paid commissions in accordance with the CBSHOME Commission Schedule; that Ollis agreed to confidentiality provisions governing CBSHOME materials; that Ollis agreed to certain expense allocations with offset rights to Ambassador against Ollis' commissions (including the right to charge a 30-percent commission collection fee) upon termination; that Ollis agreed to procure automobile insurance within certain insurance policy limits; that CBSHOME would provide certain office accommodations; that the parties would resolve disputes in certain ways; and other related provisions.

According to the affidavit of Scott Vogt who identified himself as the Chief Executive Officer and broker of record for CBSHOME and Chief Operating Officer (COO) for Ambassador:

> [Ambassador] and CBSHOME announced in late 2018 that they would merge as companies based on their, now, common ownership with the merged company being called "Ambassador." Independent cont[r]actor agents were informed that they needed to change their affiliation from a broker under "CBSHOME" to a broker under "Ambassador" before the end of the year.

Vogt went on to describe that Ollis' Broker-Salesperson Contract with CBSHOME was assumed in the merger; that in October 2018, Ollis decided to move his license to Ambassador, signed a "Maximum 100% Commission Plan," and subsequently signed an "Independent Contractors Agreement" with Ambassador in November. Vogt then stated that "[Ollis] and his team began to conduct business as agents for Ambassador and also had transactions for CBSHOME as well that had already been put under contract or 'pended' as the term is used in the industry."

Similar to the Broker-Salesperson Contract between Ollis and CBSHOME, the Independent Contractors Agreement between Ollis and Ambassador described Ollis as a "Sales Associate [who] shall conduct all licensed real estate activities in which the Sales Associate becomes involved during the term of this Agreement exclusively in association with . . . Ambassador"; that Ollis would be considered an independent contractor under the arrangement; that Ambassador would make its listings available to Ollis; that Ollis would use "diligent" efforts to sell real estate listed with Ambassador; that Ollis would abide by applicable rules and regulations; that Ollis would be paid commissions in accordance with the commission schedule until "[Ambassador] and [Ollis] agree to amend their arrangement"; that Ollis agreed to certain confidentiality obligations governing Ambassador materials; that Ollis agreed to certain sales expense obligations; that Ollis agreed to procure certain automobile and professional errors and omissions insurance within defined limits; that Ambassador would provide certain office accommodations; that the parties would resolve disputes in a defined manner; and other related matters including, but not limited to, a termination clause which provided:

> This agreement may be terminated by either party upon three (3) days prior written notice. The Agreement shall automatically terminate upon the death of [Ollis]. In the event

of such termination, all purchase agreements and sales contracts, solicited by [Ollis] and executed partially and wholly prior to the effective date of such termination, though not closed prior to such effective date, shall remain subject to this Agreement. In the event of any termination, all listings remain the property of [Ambassador].

Commissions to which [Ollis] may be entitled by reason of such purchase agreements, sales contracts or listings shall be paid to [Ollis] within three (3) days of actual receipt of such commissions by [Ambassador].

Separately, in the "Maximum 100% Commission Plan," which was signed prior to the Independent Contractor Agreement, the parties described that Ollis would pay Ambassador a base monthly rate of $990 (Base Rate) together with other fixed charges associated with listings and sales, subject to the following language:

Ollis (Agent) agrees to be on [Ambassador]'s Maximum 100% Commission Plan until 3-31-20 (date) with the following understanding: 100% program fee of $990/month, office fee of (no office selected) month, and any Buyer's Agent fees of $250/month to be waived through **3-31-19** (date) with the billing fee for the 100% program, office fee, and Buyer's Agent fees beginning **4-1-19** (date). It is also understood that Agent will receive a credit up to **$5,000** for conversion costs to use signs, business cards, and other marketing materials as established by agent. Agent understands and agrees that there will be additional cost should agent chose to have an office.

(Emphasis in original).

In December 21, 2018, Ollis terminated his relationship with Ambassador and sought payment for the commissions due to him but not yet paid by Ambassador. In March 2019, Ollis filed a complaint alleging Ambassador breached the terms of the Independent Contractors Agreement with Ollis and committed conversion by failing to pay Ollis the commissions owed to him. Ollis further requested the court award him prejudgment interest. In its answer, Ambassador denied Ollis' allegations and brought a counterclaim claiming Ambassador had the right to offset commissions owed to Ollis relating to monthly amounts Ollis owed Ambassador, that being 12 months of Ollis' unpaid Base Rate of $990 per month under the Maximum 100% Commission Plan for a total of $11,880 together with $1,900 for a marketing and technology fee. In his affidavit, Ollis claimed he was owed $13,700 in commissions and that neither the alleged unpaid Base Rate or marketing and technology fee were owed by him. Thus, the lawsuit basically boiled down to whether Ambassador was entitled to collect 12 months of Base Rate from Ollis and offset the Base Rate and a marketing and technology fee against Ollis' commissions.

Both Ollis and Ambassador filed cross-motions for summary judgment claiming that pursuant to the undisputed facts in the offered affidavits and aforementioned contracts, each party was entitled to judgment as a matter of law on its claim for damages.

The district court entered an order finding the Independent Contractors Agreement and Maximum 100% Commission Plan superseded the Broker-Salesperson Contract and governed the parties' dispute. The court found the parties did not dispute Ollis' ability to terminate the agreement pursuant to the termination provision contained in the Independent Contractors Agreement.

Further, the court found that after termination, there is no reference to the continuation of payments required under the Maximum 100% Commission Plan. The court determined that because Ollis had terminated the agreement, Ambassador owed Ollis $11,880 pursuant to the terms of the contract.

Ambassador has timely appealed to this court and Ollis filed a cross-appeal.

## ASSIGNMENTS OF ERROR

Ambassador assigns that the district court erred in (1) finding the Ambassador Independent Contractors Agreement superseded the CBSHOME Broker-Salesperson Contract and that, by implication, the court erred in finding there was no right to setoff against the commissions, the Base Rate fees owed by Ollis to the Ambassador, or, in the alternative, the right to charge 30 percent against those commissions under a term in the Broker-Salesperson Contract, and (2) awarding Ollis $11,880 rather than finding Ollis breached the Independent Contractors Agreement and Maximum 100% Commission Plan.

In his cross-appeal, Ollis assigns the district court erred (1) in failing to award him $1,900 in commissions because he did not owe Ambassador a marketing and technology fee and (2) by failing to award Ollis prejudgment interest at the statutory rate of 12 percent pursuant to Neb. Rev. Stat. § 45-104 (Reissue 2010).

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Dondlinger v. Nelson*, 305 Neb. 894, 942 N.W.2d 772 (2020). An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id*. An appellate court reviews a grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Gonzales v. Nebraska Pediatric Practice*, 308 Neb. 571, 955 N.W.2d 696 (2021).

The construction of a contract is a question of law, and when reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Village of Memphis v. Frahm*, 287 Neb. 427, 843 N.W.2d 608 (2014). Awards of prejudgment interest are reviewed de novo. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

## ANALYSIS

### GOVERNING CONTRACT

Ambassador first contends the district court improperly found the Independent Contractors Agreement superseded the Broker-Salesperson Contract. Ambassador argues that both the Broker-Salesperson Contract and Independent Contractors Agreements remain operative and that Ambassador had the right to invoke set-off provisions in the Broker-Salesperson contract to offset

amounts it claimed Ollis owed Ambassador against commissions Ambassador owed Ollis following his termination. Neither party disputes that CBSHOME merged into Ambassador, that Ambassador was the surviving entity in the merger, that Ambassador assumed CBSHOME's prior contract with Ollis, and that Ollis was encouraged to and ultimately did sign a new Independent Contractors Agreement with Ambassador. Because the Independent Contractors Agreement superseded the Broker-Salesperson contract, we look to the law of superseding contracts to resolve this first assignment.

Concerning the law on superseding contracts, the Nebraska Supreme Court stated:

17A C.J.S. *Contracts* § 395 at 475-76 (1963) sets forth the rule with regard to subsequent inconsistent agreements as follows: "A contract complete in itself will be conclusively presumed to supersede and discharge another one made prior thereto between the same parties concerning the same subject matter, where the terms of the latter are inconsistent with those of the former so that they cannot subsist together. However, deviations or changes in a contract do not necessarily abrogate it or imply its abandonment, and where it is claimed that by reason of inconsistency between the terms of the new agreement and those of the old one is discharged, the fact that such was the intention of the parties must clearly appear."

This statement of law is specifically affirmed in *Hagerbaumer v. Hagerbaumer Brothers, Inc.*, 208 Neb. 613, 305 N.W.2d 4 (1981), and *In re Estate of Wise*, 144 Neb. 273, 13 N.W.2d 146 (1944).

*Caro, Inc. v. Roby*, 215 Neb. 897, 904-05, 342 N.W.2d 182, 186 (1983).

Applying the law to the present case, we read the second contract, referring to the Independent Contractors Agreement, to be one "complete in itself" in that it details, almost identically, the exact same subject matter addressed by the parties in the former Broker-Salesperson Agreement and set forth the full duties and responsibilities of the parties under their subsequent association. Further, the provisions of the latter are inconsistent with the former in numerous respects. For example, the new Independent Contractors Agreement affirmatively expresses that Ollis will now serve as the exclusive sales associate for Ambassador subject to the terms of the Agreement; the terms of both contracts provide conflicting provisions and obligations as to the limits on required automobile liability insurance coverage and errors and omissions liability insurance obligations; the contracts provided differing terms governing the termination of the contract with setoff rights contained only in the former agreement; the terms require conflicting provisions governing which business enterprise Ollis was obligated to promote; differing confidentiality provisions; and numerous other conflicting provisions. In short, the full comprehensive nature of the Independent Contractors Agreement taken together with its inconsistencies with the Broker-Salesperson Contract render it clear that these agreements cannot subsist together. Thus, we agree with the district court's findings that the Independent Contractors Agreement superseded the Broker-Salesperson Contract and as such is the controlling contract governing the parties.

Ambassador next argues that pursuant to the Maximum 100% Commission Plan, Ollis agreed to pay the Base Rate program fee of $990 per month for a period of one year in exchange

for Ambassador not charging that Base Rate for the initial four months of the term of the agreement. Ambassador argues that although Ollis had the right to terminate the agreement, the agreement required Ollis to pay for these Base Rate Services for a full 12 month period from April 2019 to March 2020 following his termination and that Ollis breached the agreement by failing to pay Ambassador for that fee. We disagree.

The Independent Contractor Agreement, which superseded the Broker-Salesperson Contract, entitled Ollis to commissions as described on the "Commission Schedule" until such time as the parties "agree to amend their arrangement." In their affidavits, both Ollis and Vogt acknowledge that the Commission Schedule referenced by the Independent Contractors Agreement was the Maximum 100% Commission Plan formerly adopted in October 2018. Vogt simply argues that under that plan, Ollis was "required to make certain monthly payments in exchange for being provided reimbursable marketing dollars and four free months" and that upon termination by Ollis in December 2018, "[Ollis] refused to pay the monthly amounts due under the 100% [Commission] for the remainder of the agreement with (sic) would amount to $11,880 or $990 for 12 months."

There are only two provisions in the Independent Contractors Agreement and Maximum 100% Commission Plan that relate to the subject. The first is the termination provision in the Independent Contractors Agreement which simply provides that either party may terminate the Agreement upon 3 days' written notice with no reference to the Base Pay obligation referred to by Ambassador which Ambassador claims triggers a full 12-month payment obligation. The second is the language in the Maximum 100% Commission Plan which simply references:

"(Agent) agrees to be on [Ambassador]'s Maximum 100% Commission Plan until 3-31-20 (date) with the following understanding: 100% program fee of $990/month, office fee of (no office selected) month, and any Buyer's Agent fees of $250/month to be waived through **3-31-19** (date) with the billing fee for the 100% program, office fee, and Buyer's Agent fees beginning **4-1-19** (date)."

(Emphasis in original).

The clear language of this agreement does not provide that a termination of the agreement, prior to March 31, 2020, will result in a future obligation by Ollis to pay that monthly "Base Rate" through March 31, 2020. It simply provides that Ollis and Ambassador agreed to that Compensation Plan through that period of time if the contract remained in place. Because the Independent Contractors Agreement clearly provided Ollis with the right to terminate the agreement with 3 days' notice at any time, we do not read this provision as obligating Ollis to continue to pay the Base Rate obligation for a fixed term. As such, we reject Ambassador's contention that the language in the Maximum 100% Commission Plan provides a specific term of the contract which governs over the general termination provision in the Independent Contractors Agreement. The Maximum 100% Commission Plan governs only the term of the parties' compensation arrangement, while the Independent Contractors Agreement termination provision governs the specific term of the contract as a whole. That termination provision allowed Ollis to terminate at any time with 3 days' notice. Accordingly, the court did not err in finding Ollis did

not breach the contract by failing to pay Ambassador the Base Rate from April 1, 2019, to March 31, 2020, following his termination in December 2018.

In his cross-appeal, Ollis argues that the record indicates Ambassador withheld $13,700 in commissions from him and the court only awarded him $11,880 relating to the Base Rate charge, but failed to award him $1,900 relating to Ambassador's claim to a marketing and technology fee. Ollis argues that even though Ambassador did not articulate any basis for applying this charge, the district court did not award him commissions relating to Ambassador's offset of a marketing and technology fee and failed to provide any explanation in its order for its rationale relating to this issue. We agree.

In his affidavit, Ollis explained he was entitled to $13,700 in commissions but that Ambassador refused to pay him claiming that Ambassador was owed $11,800 in Base Rate charges and $1,900 for a marketing and technology fee. In response, Ambassador supplied an affidavit from its COO which explained why it withheld the Base Rate charge but failed to explain or even reference a marketing or technology fee. Instead, Ambassador's affiant referred to a provision in the CBSHOME Broker-Salesperson agreement governing a right to charge Ollis a 30-percent closing fee for collecting commissions. But as we explained earlier in this opinion, that contract was superseded by the Ambassador Independent Contractor Agreement which contained no like provision. Because Ambassador had no right to charge Ollis under the terms of the superseded contract, the district court erred in failing to award Ollis the additional $1,900 in commissions relating to that charge.

PREJUDGMENT INTEREST

Ollis' second assignment of error is that the district court erred by not awarding him prejudgment interest in the amount of $2,540.25.

When discussing prejudgment interest, the Nebraska Supreme Court has recognized:

[T]he Legislature has created three separate ways to recover prejudgment interest, and none is preferred. Section 45-103.02(1) authorizes the recovery of prejudgment interest on unliquidated claims when the statutory preconditions are met, § 45-103.02(2) authorizes the recovery of prejudgment interest on liquidated claims, and § 45-104 authorizes the recovery of prejudgment interest on four categories of contract-based claims without regard to whether the claim is liquidated or unliquidated.

*Weyh v. Gottsch*, 303 Neb. 280, 314, 929 N.W.2d 40, 63 (2019). The Nebraska Supreme Court further clarified:

Section 45-104 applies to four types of judgments: (1) money due on any instrument in writing; (2) settlement of the account from the day the balance shall be agreed upon; (3) money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof; and (4) money loaned or due and withheld by unreasonable delay of payment.

*AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 61-62, 948 N.W.2d 212, 228-29 (2020).

Here, the first type of judgment, money due on any instrument in writing, may apply to the present matter. The Independent Contractors Agreement specified that upon termination of the agreement, Ambassador would pay Ollis any commissions due to him within 3 days of the actual receipt of such commissions by Ambassador. While Ollis provided his affidavit to establish he was owed commissions because "I had sold property but had not yet been paid commissions for those sales pursuant to the terms of the Commission Agreement," he did not state the date Ambassador received any such commissions which would be the trigger date of Ambassador's payment obligation under the contract. Because Ollis failed to provide the date of when Ambassador actually received such commissions, we are unable to determine the commencement date of any such prejudgment interest obligation. As such, we need not decide whether this contract is an instrument in writing under § 45-104 and we cannot find the district court erred in failing to award Ollis prejudgment interest. This assigned error fails.

CONCLUSION

For the reasons stated herein, we conclude the district court did not err in awarding Ollis $11,880 in commissions and finding Ambassador had no right to charge Ollis $11,880 relating to the Base Rate fee, but did err in failing to award Ollis an additional $1,900 in commissions relating to an erroneous charge for an alleged marketing and technology fee. Further, we find that on this record, the court did not err in failing to award prejudgment interest.

AFFIRMED IN PART, AND IN PART REVERSED.